# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRITZ EMMANUEL LESLY MIOT,**<br> Notice of address filed under seal pursuant to<br> LCvR 5.1(c); | |
| **RUDOLPH CIVIL**,<br> Notice of address filed under seal pursuant to<br> LCvR 5.1(c); | Case No. 1:25-cv-02471 |
| **MARLENE GAIL NOBLE,**<br> Notice of address filed under seal pursuant to<br> LCvR 5.1(c); | |
| **MARICA MERLINE LAGUERRE,**<br> Notice of address filed under seal pursuant to<br> LCvR 5.1(c); **and** | |
| **VILBRUN DORSAINVIL,**<br> Notice of address filed under seal pursuant to<br> LCvR 5.1(c); | |
|     *Plaintiffs*, | |
|   v. | |
| **DONALD J. TRUMP, in his official capacity as**<br>**President of the United States of America**,<br> 1600 Pennsylvania Avenue NW Washington, DC<br> 20500; | |
| **UNITED STATES OF AMERICA**,<br> Serve: Pamela Jo Bondi<br> U.S. Attorney General<br> U.S. Department of Justice<br> 950 Pennsylvania Avenue NW<br> Washington, DC 20530; | |
|  Serve: Jeanine Ferris Pirro<br> Interim U.S. Attorney, D.D.C.<br> 601 D Street NW<br> Washington, DC 20579; | |

THE DEPARTMENT OF HOMELAND
SECURITY,
  2707 Martin Luther King Jr. Avenue SE
  Washington, DC 20528; **and**

**KRISTI NOEM, in her official capacity as**
**Secretary of Homeland Security,**
  2707 Martin Luther King Jr. Avenue SE
  Washington, DC 20528;

        *Defendants*.

## AMENDED CLASS ACTION COMPLAINT

Haiti is a nation in chaos. In the past several years, violent gangs have taken over Haiti,

establishing a "mafia-like model that is so entrenched that the country can barely function without

their consent."[1]  These gangs "function like armed militias, controlling large swathes of the

country."[2]  In 2024, gang violence led to "[m]ore than 5,600" killings and 1,400 kidnappings.[3]

Conditions have not improved in 2025.  In just the first five months of 2025, gang violence led to

over 4,000 homicides.[4]  And between July 1 and September 30, 2025 there were "at least 1,247"

additional homicides.[5]  On November 19, 2025, U.S. Deputy Secretary of State Chrisopher Landau

---

[1]  *Last Chance? Breaking Haiti's Political and Criminal Impasse*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 10 (Jan. 2025), https://globalinitiative.net/wp-content/uploads/2025/01/Last-chance-Breaking-Haitis-political-and-criminal-impasse-GI-TOC-January-2025.pdf

[2]  *From Criminal Governance to Community Fragmentation: Addressing Haiti's Escalating Crisis*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 1 (Sept. 2025), https://globalinitiative.net/wp-content/uploads/2025/09/From-criminal-governance-to-community-fragmentation-Addressing-Haitis-escalating-crisis-GI-TOC-September-2025.pdf

[3]  *New leader takes over Haiti's transitional presidential counsel as violence persists*, ASSOCIATED PRESS (March 7, 2025), https://apnews.com/article/haiti-transitional-presidential-council-fritz-alphonse-jean-gangs-e95b666317c278fee61e5ef1fac7b01b; Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms*, NBC NEWS (March 8, 2025), https://www.nbcnews.com/news/nbcblk/haitian-immigrants-grapple-uncertainty-tps-end-date-looms-rcna193868.

[4]  *Security Council renews UN's Haiti mission amid spiraling crises*, UN NEWS (July 14, 2025), https://news.un.org/en/story/2025/07/1165391.

[5]  *Gang Violence in Haiti Continues to Spread Beyond the Capital, Reaching the Rural Areas of Artibonite and Centre*, BINUH (Nov. 12, 2025), https://binuh.unmissions.org/en/gang-violence-haiti-continues-spread-beyond-capital-reaching-rural-areas-artibonite-and-centre.

posted online that gang violence in Haiti has recently "escalated."[6]  As of the date of this filing, U.S. State Department warns: "Do not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited healthcare;" noting that "Haiti has been under a State of Emergency since March 2024" and that "[c]rimes involving firearms are common in Haiti," including "robbery, carjackings, sexual assault, and kidnappings for ransom."[7]  The State Department's travel advisory bluntly states: "Do not travel to Haiti for any reason."[8]

And though it is most pronounced in Haiti's capital city of Port-au-Prince, where gangs control an estimated 90% of the territory,[9] no part of the country is safe.  In 2025, "[g]angs' territorial expansion has reached unprecedented levels and continues to advance."[10]  "During the third quarter of 2025" gang violence "continued to spread to the peripheral and rural areas of Port-au-Prince, as well as to the Artibonite and Centre departments."[11]  Indeed, Haitian police estimate that, as of December 1, 2025, "50% of the Artibonite region had fallen under gang control" following "large-scale attacks targeting towns including Bercy and Post-Sonde."[12]  Put simply, in

---

[6]  Christopher Landau, (@DeputySecState) X (Nov. 19, 2025), https://x.com/DeputySecState/status/1991271188903952889 (last visited Dec.4, 2025).
[7]  Travel Advisory: Haiti, U.S. Dept. of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html?gad_source=1&gad_campaignid=44031958015&gclid=Cj0KCQjw4qHEBhCDARIsALYKFNMYgiXJO6vJBxqwyd5WE0eBkljwcoBVZpnrv6RFdLQPI1AN5c2rfwQaAo1hEALw_wcB.
[8]  *Id.*
[9]  *Haiti's gangs have 'near-total control' of the capital as violence escalates, UN says,* ASSOCIATED PRESS (July 2, 2025), https://apnews.com/article/un-haiti-gangs-capital-violence-government-kenya-c14dd55725e2e415b794ab88b4184e65.
[10]  *From Criminal Governance to Community Fragmentation, supra* note 2.
[11]  BINUH, *supra* note 5.
[12]  Junior Racine, Danica Coto, and Evens Sanon, *Gangs launch large-scale attack in Haiti's central region as hundreds flee gunfire and burning homes,* ASSOCIATED PRESS (Dec. 1, 2025), https://apnews.com/article/haiti-gangs-attack-pont-sonde-bercy-gran-grif-4a3a091383202babec7939b630c1691e.

recent months, not just the capital but "rural communities have increasingly become targets of indiscriminate attacks."[13]

Taking circumstances from bad to worse, the gangs dominating Haiti frequently target hospitals, murdering or kidnapping doctors and nurses.[14]  Consequently, "only 37 per cent of Haiti's health facilities in Port-au-Prince are fully functional."[15]  Given the collapse of Haiti's health care system, the country was ill-equipped to confront a 2024 cholera outbreak with over 10,000 reported cases and remains ill-equipped to handle future public health crises.[16]  On April 8, 2025, Doctors Without Borders, which typically operates in warzones, closed two medical facilities because of armed attacks against its ambulances.[17]  In October 2025, because of a surge in gang violence, Doctors Without Borders permanently closed its emergency medical center, which had been "hit several times by stray bullets."[18]

The violence has left "more than 1 million people homeless."[19]  In 2024, Haiti alone "accounted for nearly 75% of global displacement cases."[20]  "Nearly one in six children in Haiti are now internally displaced, and almost 700,000 minors live without stable shelter or secure

---

[13] Haiti, Global Centre for the Responsibility to Protect (Nov. 14, 2025), https://www.globalr2p.org/countries/haiti/#:~:text=Since%20the%20assassination%20of%20President,and%20humanitarian%20organizations%2C%20has%20increased.

[14] *Haiti gang crisis: Top rights expert decries attacks on hospitals*, UN NEWS (Jan. 3, 2025), https://news.un.org/en/story/2025/01/1158721#:~:text=%E2%80%9CCriminal%20gangs%20have%20murdered%20and,close%20or%20suspend%20their%20operations%E2%80%9D.

[15] *Id.*

[16] *External situation report: Multi-country outbreak of cholera*, WORLD HEALTH ORGANIZATION (Jan. 24, 2025), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20250110_multi-country_outbreak-of-cholera_sitrep--22.pdf?sfvrsn=568bfb6d_3&download=true.

[17] *"Extremely painful decision": MSF withdraws from two facilities in Port-au-Prince*, DOCTORS WITHOUT BORDERS (April 8, 2025), https://www.doctorswithoutborders.org/latest/extremely-painful-decision-msf-withdraws-two-facilities-port-au-prince.

[18] *Doctors Without Borders permanently closes its emergency center in Haiti's capital*, ASSOCIATED PRESS (Oct. 15, 2025), https://apnews.com/article/haiti-msf-doctors-without-borders-center-closes-violence-68595071309e258e9c67ca233eb31822

[19] Evens Sanon, *Gangs attack a neighborhood in Haiti that's home to the country's elite*, ASSOCIATED PRESS (Feb. 4, 2025), https://apnews.com/article/haiti-gang-violence-kenscoff-capital-97e5fd96b963670a4faf8675d1ea7310.

[20] *From Criminal Governance to Community Fragmentation, supra* note 2.

housing."[21]   Those displaced have been forced into "improvised shelters" or have taken up residence in "schools, churches and even government buildings," many of which "have no running water, flushing toilets or garbage pickup."[22]   "The humanitarian crisis in Haiti has reached 'alarming levels'" with "nearly 2 million people facing emergency levels of food insecurity and 6,000 in catastrophic conditions facing starvation."[23]

These facts "only partially capture the gravity of the situation.   Haiti is no longer experiencing a gradual decline, but a structural transformation."[24]

Due in large part to these conditions, many Haitians present in the United States enjoy Temporary Protected Status ("TPS"), a humanitarian status enshrined into law by Congress to further a core American value: That the United States is a "beacon of freedom" to those displaced from their homelands by havoc beyond their control. 126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley).

A country can be designated for TPS if its citizens are unable to return to their home country due to armed conflicts, environmental disasters, or "other extraordinary and temporary conditions."  8 U.S.C. § 1254a(b).  Once a country is designated for TPS, eligible citizens of that country who are present in the United States receive deportation protections and work authorization until the country's TPS designation is lawfully terminated.  *See* 8 U.S.C. § 1254a(a)(1).

---

[21]   *Id.*
[22]   Frances Robles, *How 360,000 Haitians Wound Up Living in Empty Lots and Crowded Schools*, N.Y. TIMES (May 10, 2024), https://www.nytimes.com/2024/05/08/world/americas/haiti-gangs-refugees-crisis.html.
[23]   *U.N. Chief warns gangs could overrun Haiti's capital without additional support*, ASSOCIATED PRESS (Jan. 23, 2025), https://www.npr.org/2025/01/23/g-s1-44314/gangs-could-overrun-haiti
[24]   *From Criminal Governance to Community Fragmentation, supra* note 2.

Subject to unlimited extensions, a TPS designation can last for up to 18 months at a time. 8 U.S.C. § 1254a(b)(2)(B). Congress, through the TPS statute, established a mandatory process for the Secretary of Homeland Security to follow to determine whether a country's TPS designation should be extended, redesignated, or terminated. Following "consultation with appropriate agencies of the Government," the Secretary must "review the conditions in the foreign state" for which the designation is in effect and, based on that review, "determine whether the conditions for such designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

Thus, the Secretary must periodically review country conditions to determine whether "extraordinary and temporary conditions" prevent TPS holders from "returning" "in safety" to their countries of origin. 8 U.S.C. § 1254a(b)(1)(C). The Secretary's country conditions review must be "grounded in fact—*i.e.*, based on objective conditions in the foreign country" and must be undertaken "in good faith." *Id*. at 346. Historically, the Secretary's country-conditions review has focused on a "broad range of issues" including public safety, health care, education, food security, gender violence, and stability of the government. *Saget v. Trump*, 375 F. Supp. 3d 280, 300 (E.D.N.Y. 2019).

On November 28, 2025 Secretary of Homeland Security Kristi Noem published in the Federal Register a notice that Haiti's TPS designation would be terminated effective February 3, 2025.

The termination notice acknowledges that Haiti is an incredibly dangerous country— noting, for example, that "[g]ang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government." 90 Fed. Reg. 54733, 54735 (Nov. 28, 2025). The termination notice acknowledges that "1.3 million people—approximately 12% of Haiti's population—have been forced to flee their homes and are internally displaced due to

escalating violence and gang violence that has 'engulfed' Port-au-Prince 'and spreads beyond.'" *Id*. And the termination notice quotes America's U.N. Ambassador Mike Waltz's October 22, 2025 assessment that "We have gangs that are terrorizing communities, extorting families, recruiting children to commit horrors on behalf of the gang leaders." *Id*.

Despite acknowledging these and other unsafe conditions, Secretary Noem contradictorily justifies termination of Haiti's TPS designation on the ground that "there are no extraordinary and temporary conditions in Haiti that precent Haitian nationals … from returning in safety." 90 Fed. Reg. at 54735.

The termination notice goes on to state that, "even if" the Secretary "found that there existed conditions that were extraordinary and temporary that prevented Haitian nationals … from returning in safety, termination of Temporary Protected Status of Haiti is still required because it is contrary to the national interest of the United States to permit Haitian nationals … to remain temporarily in the United States." 90 Fed. Reg. at 54735; *see* 8 U.S.C. § 1254a(b)(1)(C). Secretary Noem's primary "national interest" rationale is that TPS incentivizes unlawful migration from Haiti to the United States and that Haiti's TPS designation must be terminated because some unspecified percentage of Haitian TPS holders are violent criminals who must be kept out of the United States. *See* 90 Fed. Reg. at 54736-37.

But Secretary Noem's stated rationale is "not her real rationale." *Saget*, 375 F. Supp. 3d at 345. Rather, the analysis in the termination notice is mere pretext for a decision to terminate Haiti's TPS that was made before Secretary Noem took office and is rooted in racial animus. Indeed, while campaigning in 2024, President Trump announced publicly that he would terminate

Haiti's TPS were he to regain power.[25]  In terminating TPS, Secretary Noem was following his orders.  That is unlawful.  *Saget*, 375 F. Supp. 3d at 360–61.

At least one of the real reasons why Secretary Noem terminated TPS is her and President Trump's discriminatory racial animus towards Haitians specifically and nonwhite immigrants generally.  While campaigning, President Trump, despite knowing the assertion was false, claimed on national television that Haitian TPS recipients were stealing and eating the house pets of American citizens while simultaneously expressing a preference for immigrants from predominantly white—in his words, "nice"—nations like Switzerland and Norway.[26]  He said that nonwhite immigrants are "poisoning the blood" of the United States.[27]  He claimed that Haitians all "have AIDS,"[28] a statement he also made during his first term.  *Saget*, 375 F. Supp. 3d at 371.  And, after taking office, President Trump made his preference for white immigrants the official policy of the United States, bestowing special refugee status on white South African immigrants while simultaneously ending lawful immigrations status for Haitians and other nonwhite immigrants.[29]

Since taking office, President Trump and Secretary Noem have openly expressed their animus towards nonwhite immigrants, including Haitians.  In a December 2025 meeting with his

---

[25]    Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[26]    Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From "Nice" Countries*, N.Y. TIMES (April 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

[27]    Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[28]    *Trump Slams Haitians attempting to enter U.S., says they 'probably have AIDS*,' ABC 7 (Oct. 10, 2024), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/.

[29]    Joey Garrison, *Who are Afrikaners?  Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025), https://www.usatoday.com/story/news/politics/2025/05/10/afrikaner-refugees-trump-welcoming-white-south-africans/83557827007/

cabinet secretaries, President Trump called nonwhite Somali immigrants "garbage."[30]  In December 2025, Secretary Noem posted online that she encouraged President Trump to expand the scope of a travel ban from 19 predominantly nonwhite countries (including Haiti) to 30 predominantly nonwhite countries.[31]  Secretary Noem described immigrants from these countries as (among other things) "leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," adding "WE DON'T WANT THEM. NOT ONE."[32]

None of this is new.  The first Trump administration also purported to terminate Haiti's TPS designation without following the statutorily mandated process.  Then, as now, the decision was "preordained and pretextual."  *Saget*, 375 F. Supp. 3d at 346.  Rather than the result of an objective, good-faith review of conditions in Haiti, the decision was "made in part due to political influence," with "both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti."  *Id.* at 346, 374.  Accordingly, a federal court correctly concluded that there were serious questions surrounding the legality of the first Trump administration's decision to terminate TPS was unlawful and preliminarily enjoined it based on Administrative Procedure Act (APA) and the Fifth Amendment's equal protection guarantee.  *See generally Saget*, 375 F. Supp. 3d 280.

Plaintiffs are individual Haitians who hold TPS.  They seek to represent a class of similarly situated Haitian TPS holders.  The short-term consequences of the Trump administration's

---

[30]  Dareh Gregorian, *Trump calls Ilhan Omar 'garbage' and says Somalis should 'go back to where they came from,'* NBC NEWS (Dec. 2, 2025), https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041

[31]  Camilo Montoya-Galvez, Nicole Sganga, Jennifer Jacobs, *Trump administration considering expanding travel ban to around 30 countries after National Guard shooting*, CBS NEWS (Dec. 2, 2025), https://www.cbsnews.com/news/trump-travel-ban-30-countries-national-guard-shooting/

[32]  Kristi Noem (@Sec_Noem), X (Dec. 1, 2025), https://x.com/Sec_Noem/status/1995642101779124476 (last visited Dec. 3, 2025).

unlawful decision are dire: TPS holders will lose their ability to legally work in the United States, jeopardizing their ability to provide for themselves and their families. The long-term consequences, however, are even worse: if forced to return to Haiti, TPS holders face imminent danger and possible death, whether from gang violence, lack of medical care, or starvation.

TPS holders cannot be criminals and retain their status: The statute expressly excludes individuals with more than one misdemeanor conviction from its protection. Nor are they a drain on public resources: The statute expressly prevents TPS holders from obtaining federal public benefits. TPS holders' labor and civic engagement have revitalized communities across America, from Brooklyn, New York and Springfield, Ohio to Miami, Florida, and numerous places in-between. Haitian TPS holders have a justified, statutorily guaranteed expectation that Haiti's TPS designation will remain in place until *lawfully* terminated.

As before, the Trump administration's decision to end Haiti's TPS designation is unlawful. It violates the APA and the Fifth Amendment. This Court should declare it unlawful and set it aside.

## **PARTIES**

1.    Plaintiff Fritz Emmanuel Lesly Miot is a Haitian TPS holder. He was born in Haiti and is 32 years old. He has held TPS since 2011. He is completing his fourth year of graduate science studies and is on track to obtain a Ph.D. in neuroscience at Loma Linda University in Loma Linda, California. His research in the laboratory, where he spends anywhere from thirty to sixty hours weekly, focuses on understanding how the processes of aging and Alzheimer's Disease damage blood vessels in the brain, with the goal of generating life-saving therapies. Mr. Miot's work authorization is based on his TPS status. In addition, he has Type 1 Diabetes (also known as "juvenile onset diabetes") which requires treatment in the form of daily insulin injections and

appointments with medical specialists.  Without his student health insurance, Mr. Miot could not afford the insulin or the specialists he needs to keep his diabetes in control.  In Haiti, neither the insulin nor the specialists would be readily accessible, if at all, even if he could afford them.  Mr. Miot's loss of TPS and work authorization and his deportation to Haiti would endanger his health, all the while curtailing his research, graduate studies, and promising future in neuroscience.

2.     Plaintiff Rudolph Civil is a Haitian TPS holder.  He was born in Haiti and is 23 years old.  He has held TPS since 2010. He lives in Bloomfield, New Jersey, and works as a software engineer for a major national bank at one of their main corporate offices in the New York City metro area.  He graduated from the University of Florida with a degree in computer engineering and plans to obtain either an MBA or a master's degree in computer engineering.  He also runs a side business as a photographer.  Even before his last entry to the United States at age seven, he would make regular family trips to the United States on tourist visas.  He is culturally American and is perceived as such.  He supports himself while also sending financial support to his aunt in Haiti, which she relies on for basic needs and the education of her three children, one of whom has Down syndrome and special needs.  He has also sent money to support his grandmother in Haiti.

3.     Plaintiff Marlene Gail Noble is a Haitian TPS holder.  She was born in Haiti and is 34 years old.  She has held TPS since 2024. She was abandoned as an infant and does not know the identities of her biological parents, nor the circumstances of why she was abandoned.  While she was a toddler living in Haiti, she contracted spinal tuberculosis, which caused her spinal cord to collapse and resulted in her being unable to sit, move, or function without additional medical care.  In 1993, when she was two years old, the Gabriel Foundation, a faith-based organization based in Florida, brought her to the United States for medical treatment for her spine.  She received

spinal fusion surgery in Florida sometime in the early 1990s. Through the same Foundation, in 1994, she was placed in the legal guardianship of a couple living in Pennsylvania. After at least three additional foster care placements, she was placed in the care of the Three Rivers American Indian Council based in Pittsburgh, Pennsylvania, for purposes of adoption. In 1997, she was placed in the home of her adoptive parents in Mercer County, Pennsylvania in 1999. Throughout her childhood, her humanitarian parole status was renewed each time before it expired, until approximately 2000 when she was nine years old. While she believed, as a teenager and young adult, that she was legally in the United States, it was never made clear to her whether she was a U.S. citizen. Ultimately, her adoptive parents were abusive to her, and she cut off all contact with them as a young adult. In 2021, she was put in contact with an immigration attorney. In October 2023, after evaluating other options for pursuing legal status in the United States that were ultimately unavailable to her, she and her immigration attorney filed a TPS application, which was approved in April 2024. She received a work authorization shortly afterward. She currently works as a prep laboratory assistant in a toxicology department. She prepares urine samples for pain management drug testing as well as blood samples for organ donor recipients. This is her second job since receiving TPS; earlier, she worked at a grocery store as a deli clerk. Her current diagnosis for her spine is kyphosis in spinal tuberculosis, which causes her much pain. She had a second spinal fusion surgery in 2017, as she outgrew the results of the first spinal fusion. She plans to continue working as able and enroll in community college to earn an associate degree in biology. She hopes to someday work as a post-mortem forensic toxicologist, which will require a four-year degree and a master's degree in forensic toxicology.

4.    Plaintiff Marica Merline Laguerre is a Haitian TPS holder. She was born in Haiti and is 21 years old. She left Haiti with her parents when they went to the U.S. Virgin Islands. She

was one year old at the time. She came to the United States with them in 2007 or 2008 as a child. She has held TPS since 2010. She moved to New York about fifteen years ago. She is married to a U.S. citizen. She attended a preparatory high school in New York where, due to a partnership between her high school and the City University of New York, she obtained not only her high school degree but an associate degree in biology before even graduating from high school. She also obtained an "Advanced Regents Diploma," which is awarded to students who have demonstrated mastery in a broader range of subjects than the standard diploma. She is studying economics at Hunter College in Manhattan, where she will be a junior when the Fall term begins in August, and works as a receptionist and administrative assistant at a licensed fiduciary firm which specializes in retirement planning. She aspires to have a career in finance, recently was one of only eighteen students nationwide to receive an Association of African American Financial Advisors SIE Scholarship associated with taking the Securities Industry Essentials exam, has been proactively networking and applying for Summer 2026 internships, and was just offered a New York 2026 Wealth Management Summer Analyst Program – Private Bank internship for the Summer of 2026 at a Long Island branch of one of the nation's largest banks.

5.    Plaintiff Vilbrun Dorsainvil is a Haitian TPS holder. He was born in Haiti and is 34 years old. He completed medical school and worked as a doctor in Haiti. His goal in attending medical school was to end corruption in Haiti's medical system, and he and other family members were politically active in Haiti. He has held TPS since 2021. He lives and owns a home in Springfield, Ohio, where he is employed full time—based on his TPS work authorization—as a Registered Nurse at Springfield Regional Medical Center. He also is a registered travel agent, although he is not currently working as such. He received an Associate Degree in Nursing (ADN) from Clark State College in Springfield and hopes to get a Bachelor of Science in Nursing (BSN)

from there.  He financially supports himself and his diabetic cousin, who lives in the United States.

He also supports several people in Haiti, including his four-year old daughter and her mother, his

mother, his godson, one of his brothers, and one of his nephews.  He would be unable to continue

supporting these people if he loses his work authorization.  He left Haiti because of attacks he both

suffered and feared because of his and his family members' outspoken views regarding corruption

in Haiti.

6.      Plaintiffs bring this action on their own behalf and also on behalf of a proposed

class of all persons in the United States who have been granted, or have applied for, TPS pursuant

to 8 U.S.C. § 1254a and 8 C.F.R. § 244.2 and named Haiti as the designated TPS country under

which they applied.

7.      Defendant Donald Trump is the President of the United States.  He is sued in his

official capacity.

8.      Defendant United States of America includes all government agencies and

departments responsible for the termination or vacatur of Haitian nationals' eligibility for TPS.

9.      Defendant Department of Homeland Security is an agency of the United States

government and is responsible for designating countries whose nationals may receive TPS, and for

administering the TPS program.

10.     Defendant Kristi Noem, who issued the decisions "partially vacating," and then

terminating, Haiti's TPS designation, is the Secretary of the Department of Homeland Security.

She is sued in her official capacity.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case

arises under the United States Constitution and the Administrative Procedure Act, 5 U.S.C.§ 551

et seq. This Court has remedial authority pursuant to the APA, 5 U.S.C. § 706, and the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 et seq.

12.    The federal government has waived sovereign immunity and permitted judicial

review of agency action under 5 U.S.C. § 702. In addition, claims against federal officials are not

barred by sovereign immunity when they seek relief other than monetary relief. *See, e.g., Larson*

*v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18-19 (1949); *Shields v. Utah*

*Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

13.    Venue is proper in the District of Columbia because each Defendant is an agency

of the United States or an officer of the United States sued in his or her official capacity. 28 U.S.C.

§ 1391(e)(1).

## LEGAL FRAMEWORK

14.    TPS was created by Congress as part of the Immigration Act of 1990. 104 Stat.

4978, 5030 (1990). TPS permits individuals from designated foreign countries to live and work

lawfully in the United States when they cannot return safely to their home countries due to armed

conflict, natural disaster, or other "extraordinary" circumstances. *See* 8 U.S.C. § 1254a.

15.    Under the TPS statute as originally enacted, TPS was administered by the Attorney

General. Although the codified language remains unchanged, in 2002, the authority to designate a

country for TPS was transferred from the Justice Department to the Department of Homeland

Security (DHS). *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45,

2177–2212 (Nov. 25, 2002); Homeland Security Act of 2002 Amendments Act, Pub. L. 108-7,

117 Stat. 11, 526–32 (Feb. 20, 2003).

16.    The TPS statute establishes both the standards and the process for determining

whether a country should receive TPS designation, and whether that designation subsequently

should be extended or terminated. *See* 8 U.S.C. § 1254a. After it has engaged in the statutorily mandated process and considered the relevant factors, DHS may grant, extend, or terminate a country's TPS designation.

17. Following "consultation with the appropriate agencies of the Government," the Secretary of Homeland Security may designate a country for TPS if she finds:

(A) that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) that—

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected;

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [DHS Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

18. DHS has the authority to designate a country for TPS for a period of six to eighteen months. 8 U.S.C. § 1254a(b)(2).

19. If an individual from a TPS-designated country satisfies the statutory eligibility criteria, that individual is granted deportation protection and employment authorization.

20. To be eligible for TPS, an individual must be a national of the TPS-designated country (or someone without nationality who last habitually resided in that country); have been

present in the United States on the date of the designation; and register within a designated time frame. 8 U.S.C. § 1254a(c)(1)(A); 8 C.F.R. § 244.2.

21.    Individuals are ineligible for TPS if they have been convicted of a felony or two or more misdemeanors in the United States. 8 U.S.C. § 1254a(c)(2)(B). Individuals also are ineligible for TPS if DHS determines that they committed a serious crime before coming to the U.S., engaged in certain enumerated activities, or constitute a danger to the security of the United States. 8 U.S.C. § 1254a(c)(2)(B)(ii); 8 U.S.C. § 1158(b)(2)(A).

22.    After the Secretary designates a country for TPS, she is required to conduct a periodic review of that designation. 8 U.S.C. § 1254a(b)(2). At least sixty days before the TPS designation expires, the Secretary, in consultation with the other appropriate agencies, must "review the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A).

23.    The purpose of the periodic review is to ascertain "whether the conditions for" the TPS designation "continue to be met." 8 U.S.C. § 1254a(b)(3)(A). For example, the Secretary must evaluate the conditions in the foreign country to assess whether there continue to be "extraordinary and temporary conditions" which "prevent aliens" "from returning … in safety," and may evaluate whether "permitting the aliens to remain" in the United States is "contrary to the national interest of the United States." 8 U.S.C. § 1254(b)(1)(C).

24.    The actual extension or termination of a country's TPS designation is a ministerial act over which the Secretary has no discretion. If the Secretary determines that the conditions for designation continue to exist, the designation must be extended. 8 U.S.C. § 1254a(b)(3)(A). Conversely, if the Secretary determines that the conditions for designation are no longer met, the designation must be terminated. *Id.* § 1254a(b)(3)(B). If the Secretary fails to make the mandated

determination within the statutorily prescribed period, the designation is automatically extended by at least six months. *Id.* § 1254a(b)(3)(C).

25.     Thus, the only circumstance under which a TPS designation may be lawfully terminated is if, as a result of the statutorily mandated periodic review, the Secretary affirmatively determines that a foreign state "no longer meets the conditions for designation under [8 U.S.C. § 1254a(b)(1)]." 8 U.S.C. § 1254a(b)(3)(B).

26.     Like the Secretary's initial decision to designate a country, the Secretary's determination whether the conditions for designation continue to exist must be the product of inter-agency consultation and a "review of the conditions in the [previously designated] foreign state." 8 U.S.C. § 1254(b)(3)(B)-(C).

27.     The "statute requires" that the Secretary's review of country conditions under sections (b)(3)(A) and (b)(3)(B) be "purely evidence-based" and conducted "in good faith." *Saget*, 375 F. Supp. 3d at 346.

28.     A decision to terminate TPS must flow from the evidence the Secretary considers; a termination decision that is "preordained" or "pretextual" violates the statute. *Saget*, 375 F. Supp. 3d at 346.

29.     Following her review, the Secretary "shall provide on a timely basis for the publication of notice" of her determination, "including the basis for the termination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A); *accord* 8 U.S.C. § 1254a(b)(3)(B) ("If the [Secretary] determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the [Secretary] shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination).").

30.     Congress placed no restrictions on the number of times TPS can be extended or redesignated (to allow later-arriving nationals to apply).  So long as the periodic mandatory review finds that the statutory conditions for designation continue to exist, the Secretary must extend the designation. 8 U.S.C. § 1254a(b)(3)(A)

31.     Given the statutorily prescribed procedure and timeline for terminating a country's TPS designation, the Secretary "does not have statutory or inherent authority to partially vacate a country's TPS designation." *Haitian Evangelical Clergy Ass'n et al. v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y. 2025).

## FACTUAL ALLEGATIONS

### History of Haiti's TPS

#### Initial Designation: January 2010

32.     Haiti was initially designated for TPS in 2010 during the Obama administration, following a devastating earthquake that killed more than 200,000 people and caused more than $7 billion in damage.  75 Fed. Reg. 3476 (Jan. 21, 2010).  Haiti's TPS designation was extended or redesignated multiple times between 2011 and 2015.  *See* 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015).  In each extension or redesignation, DHS outlined conditions arising from the 2010 earthquake and its attendant damage to infrastructure, public health, agriculture, transportation, and educational facilities.  Each extension or redesignation also cited the cholera epidemic that had broken out in Haiti following the 2010 earthquake, as well as the earthquake's exacerbation of Haiti's pre-existing vulnerabilities, including food insecurity and a lack of adequate housing.

33.     As detailed below, the first Trump administration unlawfully tried to end Haiti's TPS designation but the U.S. District Court for the Eastern District of New York enjoined that attempt.  *See generally Saget*, 375 F. Supp. 3d 280.

Designation: January 2021

34.     During the Biden administration, DHS Secretary Alejandro Mayorkas, recognizing that Haiti's troubles went well beyond the earthquake and its lingering effects, designated Haiti for TPS on August 3, 2021.  86 Fed. Reg. 41863 (Aug. 3, 2021).  Secretary Mayorkas concluded that "Haiti is grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses."  *Id.* at 41864.  Further, Secretary Mayorkas cited Haiti's dire economic conditions, severely limited healthcare infrastructure, and pervasive food insecurity as additional reasons that justified the country's TPS designation. *See generally*, *id.*

35.     As to Haiti's political crisis, Secretary Mayorkas noted that "[d]ue to political gridlock and the failure of parliament to approve an elections law and a national budget, parliamentary elections scheduled for October 2019 did not take place," and that the country's president was engaging in "rule by decree, without a legislative body," after the parliament lapsed, leaving only 10 senators and no deputies remaining in office.  86 Fed. Reg. at 41864–65.

36.     With respect to human rights violations and abuses, Secretary Mayorkas concluded among other things that Haiti's President

> became increasingly authoritarian through reliance on executive decrees to accomplish his agenda, including the creation of an intelligence agency accountable only to the president. The Human Rights Component of the United Nations Integrated Office in Haiti and the Office of the High Commissioner for Human Rights reported a staggering 333% increase in the number of human rights violations and abuses by law enforcement officials and non-state actors, respectively, against the rights to life and security of person in the period between July 2018 and December 2019.

86 Fed. Reg. at 41865.

37.     With respect to security concerns, Secretary Mayorkas found, among other things, that "[v]iolent criminal gangs pose a growing challenge to state authority, including de facto control of territory," and that "[f]rom 2019–2021 a new federation emerged, uniting urban criminal

19

gangs that control entire neighborhoods in the capital city of Port-au-Prince." 86 Fed. Reg. at 41865. Citing a U.S. State Department report, Secretary Mayorkas further noted that "gang activity was also on the rise outside of Port-au-Prince" and that the last months of 2020 "were particularly dangerous, with 14 kidnappings reported at that time." *Id*. Similarly, he noted, "[i]n January 2021, a leading Haitian human rights organization, the Center for the Analysis and Research of Human Rights … [found] that over a third of Haiti's voters now live in areas controlled by criminal gangs." *Id*. at 48166. Secretary Mayorkas further found that Haitian police and state officials were complicit "in gang attacks that left hundreds of people dead" and that "[r]obberies and kidnappings have become a daily reality as buses get intercepted by armed gangs controlling access to large swaths of the country." *Id*.

38.     As to Haiti's economic situation, Secretary Mayorkas concluded that

Haiti's economic and social development continue to be hindered by political instability, governance issues, and fragility. With a Gross Domestic Product (GDP) per capita of US $1,149.50 and a Human Development Index ranking of 170 out of 189 countries… Haiti remains the poorest country in the Latin America and Caribbean region and among the poorest countries in the world.

86 Fed. Reg. at 41866. He further found that "[p]ublic frustration with economic woes has contributed greatly to ongoing demonstrations, some of which have become violent." *Id*.

39.     Concerning healthcare, Secretary Mayorkas found that "only 31% of Haitians have access to healthcare services" and that numerous "vector-borne diseases are prevalent in Haiti, including malaria, chikungunya, dengue, and Zika." 86 Fed. Reg. at 41867. And Secretary Mayorkas found that in a "country of 11 million people … Haiti only has the capacity to treat a few hundred patients at a time, due to suboptimal coordination within the state apparatus [and] inadequate funding of the national response plan." *Id*.

40.    Concerning food insecurity, Secretary Mayorkas found that "[a]ccording to the World Food Programme … Haiti has one of the highest levels of food insecurity in the world," with "[m]ore than half of the population … chronically food insecure."  86 Fed. Reg. at 41867. He also found that, "[a]ccording to UNICEF, 4.1 million Haitians (nearly 40 per cent of the Haitian population) are estimated to be food insecure, and the estimated number of children suffering from acute malnutrition has risen to 167,000."  *Id.*

41.    As for access to basic services, Secretary Mayorkas further found that, "as a result of deadly gang clashes, the displaced are in need of urgent humanitarian assistance and protection," and that "[p]riority needs include sanitation, shelter, access to clean water and food."  *Id.*

42.    Based on these and other factors, Secretary Mayorkas concluded, "after consultation with the appropriate U.S. Government agencies," that "the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met."  86 Fed. Reg. at 41868.  Secretary Mayorkas designated Haiti for TPS for eighteen months "from August 3, 2021 through February 3, 2023."  *Id.*

<u>Redesignation and extension: January 2023</u>

43.    On January 26, 2023, Secretary Mayorkas both redesignated Haiti for TPS and extended Haiti's then current TPS designation, allowing both existing beneficiaries and new arrivals to apply for TPS under the new designation.  88 Fed. Reg. 5022 (Jan. 26, 2023).  Secretary Mayorkas "determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain and that such extension is not contrary to the national interest of the United States" and "further determined that redesignating Haiti for TPS based on extraordinary and temporary conditions … is warranted, including a determination that redesignation is not contrary to the national interest of the United States."  *Id.*

at 5025.  In pertinent part, Secretary Mayorkas cited Haiti's continued political turmoil and country-wide security concerns, recent environmental disasters, humanitarian abuses, deteriorated economic conditions, and continuing food insecurity as reasons justifying extension of the TPS designation.

44.    Concerning the political situation, in addition to making many of the same findings set forth in his 2021 designation, Secretary Mayorkas noted that after the July 7, 2021, assassination of Haiti's president, the then-recently appointed prime minister "was installed as head of a new government" that in turn "collud[ed]" with "illegal armed groups … in the absence of political will to hold corrupt officers accountable."  88 Fed. Reg. at 5025–26.

45.    Concerning the security situation, Secretary Mayorkas found, among other things, that following the July 2021 assassination of its president, "Haiti has experienced a sharp deterioration in an already fragile security situation," and that "[g]ang violence and kidnappings have spiked throughout the country, particularly in the capital, Port-au-Prince."  *Id*. at 5026.  In particular,

> The United Nations documented 934 killings, 684 injuries, and 680 kidnappings in Port-au-Prince from January to June 2022. In one 10-day period in July 2022, more than 200 people were killed in gang violence in Port-au-Prince; nearly half of the decedents had no gang ties.

*Id*.  Further, the Secretary found that

> Haitian gangs have also attacked religious and government infrastructure. On June 10, 2022, a gang known as 5 Seconds took temporary control of the Court of First Instance, the main courthouse in Port au Prince. While the courthouse had not been used for criminal trials for several years due to persistent insecurity, the gang nevertheless forced judicial officials out and stole computers, desks, and other assets.

*Id*.  The Secretary also found that

> In mid-September, gangs blocked access to the Varreux Terminal in Port-au-Prince, the main entry point for fuel in Haiti, cutting off millions of gallons of diesel and gasoline and causing a severe fuel shortage. The fuel blockage paralyzed Haiti's

economy. Health centers and hospitals had to close, and the distribution of water was interrupted. The lack of access to clean water contributed to the outbreak of cholera in early October, and complicated efforts to respond to and contain the outbreak.

*Id*.

46.    In addition, Secretary Mayorkas identified "recent environmental disasters" that "contributed to the extraordinary and temporary conditions in Haiti." 88 Fed. Reg. at 5027. He cited both (1) the "7.2 magnitude earthquake [that] hit the southern region of Haiti" on August 14, 2021, "killing more than 2,200 people, injuring 12,700, destroying 130,000 homes, and leaving thousands of people in urgent need of assistance", and (2) Tropical Storm Grace, which struck just two days later and unleashed "torrential rains [that] caused floods and landslides in the same departments affected by the earthquake, as well as in Sud-Est." *Id*.

47.    Concerning the humanitarian situation, Secretary Mayorkas found, among other things, that "Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22% of children chronically malnourished." 88 Fed. Reg. at 5027. He further noted:

As of October 2022, the total number of people in acute food insecurity stood at 4.7 million people, including 1.8 million people in the 'emergency' phase on the World Food Program's (WFP) Integrated Food Security Classification Index. For the first time ever, 19,000 Haitians are considered to be in the 'catastrophe' phase (the most severe classification).

*Id*. Secretary Mayorkas found that Haiti's security situation exacerbated its humanitarian situation:

Armed clashes between gangs destroyed water networks and disrupted water truck deliveries in several Port-au-Prince neighborhoods during 2022. A Doctors Without Borders project coordinator noted that in addition to an epidemic of scabies directly connected to the lack of water since the beginning of 2022, people could only 'afford small quantities of drinking water, but they [couldn't] access clean water in quantities needed for hygiene.'" *Id*. "Adding to the struggle Haitians face to meet their basic needs, two WFP warehouses were looted and pillaged in September 2022, resulting in the loss of approximately $6 million of relief assistance, including 2,000 tons of food." *Id*. And "[t]he United Nations and the Haitian government have reported a new cholera outbreak, with the first cases detected

between October 1-2, 2022. As of November 15, 2022, there were 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.

*Id.*

48.    Concerning Haiti's economy, Secretary Mayorkas concluded that

Haiti's economy has floundered. Haiti is among the countries with the greatest inequality in the region. The richest 20% of its population holds more than 64% of its total wealth, while the poorest 20% has less than 1%.

88 Fed. Reg. at 5027.

49.    "In summary," Secretary Mayorkas concluded, "Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity."  88 Fed. Reg. at 5028.

<u>Redesignation and extension: July 2024</u>

50.    On July 1, 2024, Secretary Mayorkas redesignated and extended Haiti's TPS designation.  89 Fed. Reg. 54484 (July 1, 2024).  Secretary Mayorkas "determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain" and "it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily."  *Id*. at 54491. Again, Secretary Mayorkas cited Haiti's continued political turmoil, security concerns, humanitarian abuses, and decimated economy as reasons justifying extension of the TPS designation.

51.    As to Haiti's political situation, Secretary Mayorkas found, among other things, that "Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they continue to escalate and expand their influence and geographic presence over large portions of metropolitan Port-au-Prince" and "several of Haiti's ten departments."  89

Fed. Reg. at 54488.  Secretary Mayorkas further noted that, "an ongoing political impasse has left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence."  *Id*.  Haiti's "justice system," he concluded, "is plagued by insecurity, corruption, strikes, and political interference."  *Id*.

52.    Concerning the security situation, Secretary Mayorkas found, among other things, that "gang violence continues to escalate and expand outside the capital and other major cities." 89 Fed. Reg. at 54488.  Secretary Mayorkas noted that, "gang violence killed or injured more than 2,500 people" in the first three months of 2024, and further noted that the gangs have "an established presence in at least six [of Haiti's ten] departments."  *Id*.  He noted that, "in early March 2024, gangs attacked police stations and stormed two prisons" allowing more than "4,700 inmates to escape."  *Id*.  Secretary Mayorkas found that the "coordinated gang attacks" have "displaced over 15,000 people from their homes in Port-au-Prince," and "the U.S. military evacuated all non-essential Embassy personnel by airlift on Saturday, March 9, and Sunday, March 10."  *Id*. at 54489.

53.    As to Haiti's humanitarian situation, Secretary Mayorkas found, among other things, that "Haiti has one of the highest levels of chronic food insecurity in the world" with "more than half of its total population chronically food insecure and 22 percent of children chronically malnourished."  89 Fed. Reg. at 54490. Secretary Mayorkas also cited the deleterious impact cholera has had in Haiti, noting that as of January 2024 "an estimated 73,000 Haitians were confirmed or suspected to have cholera across all ten departments."  *Id*. at 55491.  "Only 55 percent of Haitian households could access safe drinking water while two-thirds of Haitians had limited or no access to sanitation services."  *Id*.  The intersection of Haiti's gang violence and deteriorated

healthcare system led Secretary Mayorkas to determine that there is a "more significant likelihood of severe disease and death for those Haitians who contract cholera." *Id*.

54.     Concerning Haiti's economy, Secretary Mayorkas found, among other things, that "amidst the political, security, and environmental crises, Haiti's economy has been decimated and threatens the future of the country." 89 Fed. Reg. at 54491.  He noted "estimate[s] that three-quarters of Haiti's healthcare facilities lack adequate medical supplies and sufficient trained personnel as the security crisis has led to a mass exodus of health workers." *Id*.

55.     Based on these and other factors, Secretary Mayorkas concluded that "after consultation with appropriate U.S. Government agencies," "the conditions supporting Haiti's designation for TPS continue to be met." *Id*.  Secretary Mayorkas designated Haiti for TPS for eighteen months "beginning on August 4, 2024, and ending on February 3, 2026." *Id*.

<u>**The Trump Administration's Preordained Agenda**</u>
<u>**to End TPS for Haiti**</u>

56.     As explained above, the TPS statute authorizes ending a TPS designation only after "consultation with appropriate agencies of the Government" (8 U.S.C. § 1254a(b)(1)), and only after an evidence-based review process.  *Id*. at §§ 1254a(b)(1)(C), (b)(3)(A), (b)(3)(B); *accord Saget*, 375 F. Supp. 3d at 346 (the use of the word "shall" in § 1254a(b)(3)(A) evidences congressional "intent that the Secretary undertake a periodic review grounded in fact—i.e., based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith").

57.     Contrary to this mandatory framework, President Trump and his surrogates made the decision to end TPS before they took office, well *before* Secretary Noem could have consulted with any government agency, let alone undertaken the statutorily prescribed review process.

58.     While campaigning for office, President Trump repeatedly said that if elected he and his administration would end Haiti's TPS.

59.     At a campaign rally on September 13, 2024, President Trump said, "We will do large deportations in Springfield, Ohio." [33]  This threat was targeted at Haitian TPS holders, specifically.  Over the past several years, thousands of Haitian TPS holders had moved to Springfield, Ohio.  The reason is simple: Although "[t]housands of new jobs had been created there, thanks to a successful effort by the city's leadership and Chamber of Commerce to attract new business to Springfield," the City's population "had dwindled to under 60,000, from about 80,000 in the late 1960s and early 1970s," which left local employers without enough native-born workers to fill the new jobs. [34]  Meeting that need, Haitian TPS holders have helped power Springfield's economic recovery.

60.     On October 2, 2024, a reporter asked President Trump whether he would end TPS for Haiti if elected to a second term.  President Trump responded unambiguously: "Absolutely I'd revoke it, and I'd bring them back to their country."[35]

61.     Signaling in advance that a second Trump administration was determined to end TPS designations without regard to the law, now-Vice President Vance, falsely describing TPS holders as "illegal aliens" even though they are in the country legally, declared during the campaign that "[w]e're going to stop doing mass grants of Temporary Protected Status," even

---

[33]  *Former President Trump Holds News Conference Near Los Angeles*, C-SPAN (Sept. 13, 2024) https://www.c-span.org/program/campaign-2024/former-president-trump-holds-news-conference-near-los-angeles/648784.

[34]  Miriam Jordan, *Why Thousands of Haitians Have Settled in Springfield, Ohio*, N.Y. TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/us/haitian-migrants-springfield-ohio.html.

[35]  Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

though the statute, by design, provides for granting blanket relief to all eligible citizens of a designated country present in the United States on the date of designation.[36]

62.    Secretary Noem too expressed a generalized hostility to TPS designations before taking office.  When asked a question about TPS in her confirmation hearing, she answered, "[TPS] has been abused and manipulated by the Biden administration, and that will no longer be allowed."[37]

63.    Secretary Noem has made clear that her decisions to end TPS for Haiti and other countries are based not on the statutorily required review process, nor on any consultation with government agencies, but on President Trump's directive to end TPS.  Concerning her decision to terminate TPS for Venezuela, for example, Secretary Noem said, "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[38]

64.    These public statements by President Trump and his surrogates are evidence that, as in the first Trump administration, the decision to end Haiti's TPS designation was a preordained decision rather than a product of the review process mandated by Congress under the statute.  That is unlawful.  *Saget*, 375 F. Supp. 3d at 346 (TPS decision that is "preordained" and not "evidence-based, as the statute-requires" is unlawful).

---

[36]    Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

[37]    *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025) https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.

[38]    Kristi    Noem    (@Sec_Noem),    X    (Jan.    29,    2025),    https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (last visited Feb. 23, 2025).

**President Trump's Motivation for Terminating TPS:**
**Discriminatory Animus Against Haitians**
**and Other Non-White Immigrants**

65.    President Trump's hostility to nonwhite immigrants it nothing new.  He has for years espoused racial animus against immigrants of color.  President Trump's and his staff's statements and actions during his first administration reflected that animus.

66.    At a White House meeting in June 2017, President Trump complained that Nigerian immigrants recently admitted into the United States would "never 'go back to their huts' in Africa."[39]

67.    At a White House meeting with U.S. Senators on January 11, 2018, President Trump disparaged an immigration plan that protected people from predominantly nonwhite nations, including Haiti, El Salvador, and several African nations, asking, "Why are we having all these people from shithole countries come here?" [40]

68.    In the same meeting, he targeted Haitians specifically, asking, "Why do we need more Haitians?"[41]

69.    He later added his view that the United States should welcome more immigrants from predominantly white Norway.[42]

---

[39]    Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, NY TIMES (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=1

[40]    *Saget*, 375 F. Supp. 3d at 371.

[41]    Ali Vitali, *Trump referred to Haiti and African nations as 'shithole' countries*, NBC NEWS (Jan. 12, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

[42]    *Id.*

70.    Norway's population is over 90 percent white.[43]  Haiti's population, by contrast, is 95 percent black.[44]

71.    Senator Richard Durbin explained that President Trump's singling out of Haitians for exclusion was "an obvious racial decision."[45]

72.    President Trump's efforts to terminate TPS during his first administration also reflected his hostility towards nonwhite immigrants.  As *Saget* details, Secretary Duke "was well aware that the White House wanted to terminate TPS for Haiti and other predominantly non-white foreign nations."[46]  Secretary Duke's own handwritten notes indicate that she understood what was happening.[47]  "This conclusion," she wrote, "is the result of an America first view of the TPS decision."[48]

73.    The administration also worked to create a public narrative that traded on insidious racial stereotypes.

74.    In early 2017, DHS and USCIS appointees sought crime and public assistance data on Haitians with TPS.[49]

---

[43] *The World Factbook: Norway*, CENT. INTELLIGENCE AGENCY, https://www.cia.gov/the-world-factbook/countries/norway/ (last updated July 23, 2025) (identifying Norway's Ethnic groups as 81.5% Norwegian, 8.9% other European, and 9.6% other).
[44] *The World Factbook: Haiti*, CENT. INTELLIGENCE AGENCY, https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html (last updated July 23, 2025) (identifying Haiti's Ethnic groups as 95% Black, and 5% mixed and White).
[45] Carl Hulse, *Inside the Oval Office Immigration Meeting that Left a Senator Stunned*, N.Y. TIMES (Jan. 19, 2018), https://www.nytimes.com/2018/01/19/us/politics/trump-durbin-immigration-daca.html
[46] 375 F. Supp. 3d at 370.
[47] *Id.* at 347-48
[48] *Id.* at 348.
[49] Alicia A. Caldwell, *AP Exclusive: US Digs for Evidence of Haiti Immigrant Crimes*, AP News (May 9, 2017), https://apnews.com/article/crime-immigration-haiti-only-on-ap-united-states-government-740ed5b40ce84bb398c82c48884be616 ("Internal emails . . . show a top immigration official wanted not only crime data on Haitians who are protected from deportation under the [TPS] program, but also how many were receiving public benefits.").

75.    In an April 2017 email, USCIS's Office of Policy and Strategy Chief directed her staff to compile "details on how many [Haitian] TPS holders are on public and private relief" and "how many have been convicted of crimes of any kind (any criminal/detainer stats you can find)."[50]

76.    She also sought information on how many were "out of work," and the number of current Haitian TPS recipients who were "illegal pre-TPS designation."[51]

77.    After staff said they could not gather that information, she pressed them to search further: "I know some of it is not captured," she said, "but we'll have to figure out a way to squeeze more data out of our systems."[52]

78.    Likewise, in an April 2017 email, Secretary of Homeland Security John F. Kelly directed staff to collect, "[s]pecific to Haiti, details on how many are on public and private relief, how many school aged kids [are] in school, how many [are] convicted of crimes of any kind."[53]

79.    "According to internal DHS communications," *Saget* explains, "officials sought this data to bolster the decision to terminate TPS for Haiti."[54]

80.    DHS's relentless efforts to manufacture prejudicial information about Haitian TPS recipients drew the attention of lawmakers, who expressed concerns about the reports[55] and alarm about "the troubling news that your department has asked for information on criminal history and public benefits use of Haitian nationals protected under [TPS]."[56]  They noted that the timing of

---

[50] Plaintiffs' Response to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1), Fed. R. Civ. P. 12(B)(6), or, alternatively, for Summary Judgment Pursuant to Fed. R. Civ. P. 56, Exhibit 20 at 1, *Saget v. Trump,* 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (No. 1:18-cv-01599-WFK-ST).
[51] *Id.*, Exhibit 20 at 49.
[52] Caldwell, *supra* note 49, *see also Saget*, 375 F. Supp. 3d at 309 (quoting April 27, 2017, email to USCIS staffers).
[53] *Saget*, 375 F. Supp. 3d at 307–08 (alterations in the original).
[54] *Id.* at 307.
[55] Letter from Sen. Bill Nelson to John F. Kelly, Sec'y, Dep't of Homeland Sec. (May 17, 2017), http://www.ijdh.org/wp-content/uploads/2016/10/2017-05-17-Nelson-to-Kelly-Haiti-TPS-Extension.pdf.
[56] Letter from Sens. Robert Menendez, et al., to John F. Kelly, Sec'y, Dep't of Homeland Sec. (May 19, 2017), https://www.menendez.senate.gov/imo/media/doc/HAITI-TPS_5_19_17.pdf.

this information request suggests that this information is pretext to deny an extension of TPS," and urged the administration to "keep [its] review within the bounds dictated by Congress."[57]

81.    President Trump has also repeatedly espoused racial animus against immigrants of color during his campaigns.

82.    For instance, in his 2016 campaign's kick-off speech, President Trump disparaged Latin American immigrants:

> When Mexico sends its people, they're not sending their best…. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists.[58]

83.    During his 2024 presidential campaign, President Trump made numerous statements demonstrating his discriminatory animus against Haitians in particular, and nonwhite immigrants generally based on their perceived race or ethnicity.   Some of these statements are described below.

84.    President Trump compared immigrants to snakes.[59]

85.    President Trump said that immigrants are "poisoning the blood" of America.[60]

86.    President Trump said that immigrants are "not people."[61]

---

[57] *Id.*

[58] *Full Text: Trump announces a presidential bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.6fa0170ce812

[59] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC* (Feb. 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; John T. Bennett, *'Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/.

[60] C-Span, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[61] Will Weissert and Jill Colvin, *Why Trump's alarmist message on immigration may be resonating beyond his base*, ASSOCIATED PRESS (Apr. 1, 2024), https://apnews.com/article/border-immigration-trump-biden-rhetoric-2024-election-327c08045edcc200f850d893de6a79d6.

87.    In the Fall of 2024, President Trump focused on Haitian TPS holders in particular. President Trump accused Haitian TPS holders in Springfield, Ohio of stealing Springfield residents' house pets, cooking them, and eating them.  At the September 10, 2024, presidential debate, President Trump falsely asserted that in

> Springfield, [Haitian immigrants are] eating the dogs. The people that came in. They're eating the cats. They're eating -- they're eating the pets of the people that live there. And this is what's happening in our country.[62]

88.    President Trump's assertion at the debate was a lie—Haitian TPS holders were not stealing peoples' pets and eating them.  Ohio's Republican Governor, Mike DeWine, stated after President Trump's accusations at the debate: "There is simply no evidence of this at all. Discussions about Haitians eating dogs is just not helpful.  And, again, these people are here legally… and they want to work, and they are, in fact working."[63]

89.    Springfield's city manager likewise stated that claims that Haitian TPS holders were stealing peoples' pets and eating them are "disinformation."[64]  Similarly, "[t]he Springfield police … denied the claims."[65]

90.    President Trump's lie that Haitian TPS holders were stealing peoples' pets and eating them reflects discriminatory animus against Haitians.  False accusation of immigrants eating animals in this manner is a very old xenophobic trope.  For example, "the way Trump has described

---

[62]    Riley Hoffman,  *READ: Harris-Trump presidential debate transcript*, ABC NEWS (Sept. 10, 2024), https://abcnews.go.com/Politics/harris-trump-presidential-debate-transcript/story?id=113560542.

[63]    Rebecca Picciotto, *'A piece of garbage': Republican Ohio Gov. condemns Trump-Vance false immigrant pet-eating conspiracy*, CNBC (Sept. 16, 2024), https://www.cnbc.com/2024/09/15/republican-ohio-gov-mike-dewine-trump-vance-false-immigrant-pets-conspiracy.html

[64]    Anastasiia Riddle, *Springfield city manager slams immigration 'rumors' and 'disinformation*, THE COLUMBUS DISPATCH (Sept. 12, 2024), https://www.dispatch.com/videos/news/politics/2024/09/12/watch-springfield-city-manager-refute-viral-immigrants-claims/75191623007/

[65]    Jasmine Garsd, *The stereotype of immigrants eating dogs and cats is storied—and vitriolic as ever*, NPR NEWS (Sept. 11, 2024),  https://www.npr.org/2024/09/11/nx-s1-5108401/donald-trump-debate-eating-dogs-cats-immigrants-false-stereotype

immigrants"—especially "those of color"—as "a threat to workers" has "parallels" to the anti-immigrant rhetoric of Grover Cleveland, who "had trading cards printed up during his 1888 run for the presidency, depicting Chinese male immigrants eating rats" and describing Chinese workers "as a threat to white American workers."[66]

91.    President Trump's campaign against Haitian TPS holders did not stop there.  In an interview on October 8, 2024, he said to "look at Springfield, where 30,000 illegal immigrants are dropped," stating that "they may [be in this country] through a certain little trick, but they are illegal immigrants as far as I'm concerned."[67]  Indicative of President Trump's disregard for the law, the "little trick" to which he derisively referred was a duly enacted statute—8 U.S.C. § 1254a—which established TPS and authorizes TPS holders' lawful presence in the United States.

92.    After initially admitting "it's possible, of course, that all of these rumors" that Haitian TPS holders were eating pets "will turn out to be false," Vice President Vance later "stood by the debunked claims," saying that he was willing "to create stories so that the American media actually pays attention," in an effort to advance President Trump's anti-immigrant agenda.[68]

93.    Two days later, on October 10, 2024, President Trump said that immigrants from Haiti  "probably have AIDS," a slur that he has wielded numerous times in his political career.[69]  A similar statement—that "Haitians 'all have AIDS'"—was cited by a federal court as evidence

---

[66]    Karen Weintraub, *et al*., *Immigrants-eat-pets trope is a century-old stereotype and 'very old racism,'* USA TODAY (Sept. 12, 2024), https://www.usatoday.com/story/news/politics/elections/2024/09/12/immigration-pets-historic-trope/75183935007/

[67]    Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie.

[68]    Maggie Astor, *Vance Sticks By Pet-Eating Claims and Says He's Willing to 'Create Stories,'* N.Y. TIMES (Sept. 15, 2024), https://www.nytimes.com/2024/09/15/us/politics/jd-vance-springfield-pets.html.

[69]    *Trump Slams Haitians attempting to enter U.S., says they 'probably have AIDS,'* ABC 7 (Oct. 10, 2024), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/.

of President Trump's unconstitutional animus against Haitian TPS holders. *Saget*, 375 F. Supp. 3d at 371.

94.    President Trump's invective during the 2024 campaign was not limited to Haitians but directed at other predominantly nonwhite immigrants as well. In an interview with *Time* Magazine, President Trump compared immigration from predominantly nonwhite countries to an "invasion like probably no country has ever seen before."[70]

95.    Similarly, during a speech to Republican Senators in February 2025, President Trump stated that there were "[m]any, many thousands and thousands of murderers" let into the country "from all over the world." He went on to falsely allege that "some of these countries allowed [in] every single prisoner," specifically calling out "countries … from Africa, from Asia, not just South America, a lot, a lot from South America, but not even the most."[71]

96.    President Trump has similarly claimed that "we know" that immigrants "come from prisons" and that "[w]e know they come from mental institutions and insane asylums."[72] Secretary Noem herself has said essentially the same thing: that "countries that hate us empty out their prisons, their mental institutions"[73] and "sent criminals to America."[74]

---

[70]    Time Staff, *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME (Apr. 30, 2024), https://time.com/6972022/donald-trump-transcript-2024-election/.

[71]    Sp*eech: Donald Trump Addresses GOP Senators at Dinner at Mar-a-Lago – February 7, 2025*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-senators-mar-a-lago-february-7-2025/

[72]    Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric with 'Poisoning the Blood' Comment*, N.Y. TIMES (Oct. 5, 2023), https://www.nytimes.com/2023/10/05/us/politics/trump-immigration-rhetoric.html

[73]    *South Dakota Gov. Kristi Noem calls on Nikki Haley to exit 2024 race*, CBS News (Mar. 4, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/

[74]    @KristiNoem, X (Feb. 27, 2024), https://perma.cc/D58Z-4X8H

97.     President Trump's and Secretary Noem's claim that immigrants from predominantly nonwhite countries are "coming from prisons and insane asylums" is—like President Trump's claim about Haitian TPS holders stealing pets and eating them—false.[75]

98.     In October 2024, President Trump suggested that immigrants who commit crimes do so because "it's in their genes," and further stated "we got a lot of bad genes in our country right now."[76]

99.     Reflecting his obsession with immigrants' physical traits, President Trump lamented the presence of immigrants from predominantly nonwhite regions of the world:

> They come from Africa. They come from Asia. They come from all over the world. They come from the Middle East, Yemen ... Large numbers of people are coming in from China.… And if you look at these people, did you see them? They are physically fit. They're 19 to 25. Almost everyone is a male, and they look like fighting age.[77]

100.     Throughout his 2024 campaign, President Trump denigrated and vilified nonwhite immigrants from across the world. In an interview with NewsNation in October 2024, he asserted:

> It's not just South America, it's all over the world. They're coming in from Africa, they're coming in from the Congo. They are coming in from all parts of South America … We have people coming in from the Middle East at numbers we have never seen. They are coming in from Asia. And it's not sustainable by us or any

---

[75]   Angelo Fichera, *Fact Checking Trump's Recent Immigration Claims,* N.Y. Times (Dec. 24,2023), https://www.nytimes.com/2023/12/24/us/politics/trump-immigration-fact-check.html; *FactChecking Trump's Rally, Fox Interview*, FactCheck.org (Mar. 30, 2023), https://www.factcheck.org/2023/03/factchecking-trumps-rally-fox-interview/; Daniel Dale, *Fact check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), https://www.cnn.com/2023/04/29/politics/fact-check-trump-mental-institutions-migrants-doctor; *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants,* The Marshall Project (Oct. 21, 2024), https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants

[76]   Patrick Svitek, *Trump Suggests 'Bad Genes' to Blame for Undocumented Immigrants Who Commit Murders*, Wash. Post (Oct. 7, 2024), https://www.washingtonpost.com/politics/2024/10/07/trump-undocumented-immigrants-bad-genes/

[77]   Alexandra Hutzler, *Trump continues to demonize migrants, falsely claims they're 'building an army'*, ABC News (May 24, 2024), https://abcnews.go.com/Politics/trump-continues-demonize-migrants-falsely-claims-building-army/story?id=110535732

country… We have drug dealers, the biggest drug dealers. We have terrorists, we have everybody.[78]

101.    Consistent with his animus toward nonwhite immigrants, President Trump portrays the areas in which they settle in the United States as "dumping grounds" that are "destroying our country."[79]

102.    Importantly, President Trump does not describe immigrants from predominantly white countries this way and has a stated preference for admitting immigrants from predominantly white countries. For example, during the 2024 campaign he asked rhetorically:

Why can't we allow people to come in from nice countries… you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?[80]

103.    After he took office, President Trump made his preference for white immigrants the official policy of the United States: In the Spring and early Summer of 2025, when the Trump administration was eliminating the lawful immigration status not only of Haitians but of immigrants from other predominantly nonwhite countries,[81] the administration simultaneously "gave special priority" to white South African immigrants, admitting them into the United States as refugees.[82]

---

[78]    Damita Menezes and Ali Bradley, *Trump on Springfield Haitian migrants: 'They have to be removed'*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/.

[79]    John T. Bennett, '*Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/.

[80]    Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From "Nice" Countries*, N.Y. TIMES (April 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

[81]    Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309 (May 13, 2025); Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (March 25, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23697 (June 4, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24151 (June 6, 2025).

[82]    Joey Garrison, *Who are Afrikaners? Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025), https://www.usatoday.com/story/news/politics/2025/05/10/afrikaner-refugees-trump-welcoming-white-south-africans/83557827007/

104.    President Trump justified his preference for white immigrants over nonwhite immigrants by claiming that white South Africans are "racially disfavored landowners."  Exec. Order No. 14204 (Feb. 7, 2025).  But that is not true: "Although white South Africans make up only 7 percent of the population, they own farmland that covers about half the country."[83]

105.    President Trump's preference only for white immigrants is not limited to white South Africans.  His administration is undertaking a "radical overhaul of the U.S. refugee system that would slash the program to its bare bones while giving preference" not only to white South Africans, but to "English speakers" and "Europeans who oppose migration. " The net effect of these changes will be to "help mostly white people who say they are being persecuted while keeping the vast majority of other people out" of the United States.  The rationale for the administration's overhaul of the refugee system is that "America's acceptance of refugees has made the country too diverse."[84]

106.    In a December 2025 meeting with his cabinet secretaries, President Trump called nonwhite Somali immigrants—and Somlian U.S. Rep. Ilhan Omar, an American citizen— "garbage."  Echoing his previous comments that Haitians are undesirable because they come from a "shithole country," President Trump said that Somali immigrants "come from hell and they complaint and do nothing but bitch, we don't want them in our country."  President Trump added "I can say that about other countries, too."[85]

---

[83]    John Eligon, Zolan Kanno-Youngs, Erica L. Green, *Trump Ambushes South African President With Video of False Claims: What to Know*, NY TIMES (May 21, 2025), https://www.nytimes.com/article/afrikaner-refugees-trump-south-africa.html

[84]    Zolan Kanno-Youngs, Hameed Aleaziz, *Trump Considers Overhaul of Refugee System That Would Favor White People*, N.Y. TIMES (Oct. 15, 2025), https://www.nytimes.com/2025/10/15/us/politics/trump-refugee-white-people.html

[85]    Dareh Gregorian, *Trump calls Ilhan Omar 'garbage' and says Somalis should 'go back to where they came from,'* NBC NEWS (Dec. 2, 2025), https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041

107.    In December 2025, Secretary Noem posted online that she encouraged President Trump to expand the scope of a travel ban from 19 predominantly nonwhite countries (including Haiti) to 30 predominantly nonwhite countries.[86]  Secretary Noem described immigrants from these countries as (among other things) "leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," adding "WE DON'T WANT THEM. NOT ONE."[87]

108.    The Trump administration does not confine its racial animus to nonwhite immigrants in America; it extends that animus to nonwhite immigrants in other predominantly white countries.  On December 5, 2025, the administration released a national security strategy claiming that Europe is facing the "stark prospect of civilizational erasure," and pledging to support anti-migration political parties in that part of the world in order to prevent a future in which "certain NATO members will become majority non-European."  The document cautions that Europe is becoming "unrecognizable" due to migration from non-white countries and that the United States should help Europe "correct its current trajectory;" the document bluntly states:  "We want Europe to remain European [and] regain its civilizational self-confidence."  The documents "echoes some of the language of the Great Replacement Theory, a nationalist conspiracy theory embraced by some of [President Trump's] top aides that warns of a deliberate effort to replace white people with nonwhite immigrants."[88]

109.    In recent months, the Trump administration has also embraced the concept of "remigration," a portmanteau of "reverse migration."  On November 28, 2025 the Department of

---

[86]   Camilo Montoya-Galvez, Nicole Sganga, Jennifer Jacobs, *Trump administration considering expanding travel ban to around 30 countries after National Guard shooting*, CBS NEWS (Dec. 2, 2025), https://www.cbsnews.com/news/trump-travel-ban-30-countries-national-guard-shooting/

[87]   Kristi Noem (@Sec_Noem), X (Dec. 1, 2025), https://x.com/Sec_Noem/status/1995642101779124476 (last visited Dec. 3, 2025).

[88]   Michael D. Shear, Jeanna Smialek and Lara Jakes, *Trump Administration Says Europe Faces 'Civilizational Erasure,'* N.Y. TIMES (Dec. 5, 2025), https://www.nytimes.com/2025/12/05/world/europe/trump-europe.html?smid=nytcore-ios-share&referringSource=articleShare

Homeland Security posted online: "The stakes have never been higher, and the goal has never been more clear:  Remigration now."[89]

110.    The term "remigration" has different meanings depending on context.  Although the literal dictionary definition has no overtly racist meaning—"the act of migrating again"[90]—for far-right groups, the term is a racist dog whistle for "creating greater ethnic homogeneity, creating Whiter countries" via forced deportation of nonwhite immigrants.[91]  As Jula Ebner, a researcher at the Institute for Strategic Dialogue at Oxford University put it, the term "sounds a lot more benign than what it actually stands for."[92]

111.    The Trump administration, since embracing the term "remigration" has been coy about its intended use.  When "CNN asked DHS to further explain the policies and context" behind its use of the term, a spokesperson responded "'Is the English language too difficult for you?' … before citing the Collins English Dictionary's definition" of the term.  "But when pressed to respond to CNN's initial inquiry" about the term's "far-right connotations" DHS did not respond."[93]

112.    On November 30, 2025, Secretary Noem appeared on NBC's *Meet the Press*.  She was asked about the term "remigration."  Specifically, Secretary Noem was asked:  "As you probably know, this term has been used in different situations, but including by the far right in Europe to call for the mass deportation of non-white immigrants.  How specifically does the Trump

---

[89]    Department    of    Homeland    Security    (@DHSgov),    X    (Nov.    28,    2025), https://x.com/DHSgov/status/1994445836915253664
[90]    *Remigration*, MIRRIAM WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/remigration
[91]    Chelsea Balley, *DHS issued a call to 'remigrate.' Here's the history of the term often associated with far-right groups*, CNN (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained
[92]    Ashifa Kassam, *How remigration became a buzzword for global far right*, THE GUARDIAN (Oct. 3, 2024), https://www.theguardian.com/world/2024/oct/03/how-remigration-became-a-buzzword-for-europes-far-right
[93]    Balley, *DHS issued a call to 'remigrate,' supra* note 91.

administration define remigration?" In response, Secretary Noem did not disavow the racist use of the term, instead reiterating talking points about "criminal illegal aliens."[94]

113.    Thus, there is both "direct and circumstantial evidence" that a "discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti." *Saget*, 375 F. Supp. 3d at 374.

### Upon Taking Office, President Trump and his Surrogates Follow Through on the Plan to End Haiti's TPS

#### February 12, 2025 "Partial Vacatur"

114.    On January 20, 2025, President Trump issued Executive Order 14159. The Order directed his new administration to "take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws."[95]

115.    The Order specifically required that TPS designations be "limited in scope."[96]

116.    On January 25, 2025, Kristi Noem was sworn in as DHS Secretary.

117.    As promised, Secretary Noem, at the direction of President Trump, issued what she styled a "partial vacatur" of Haiti's TPS designation on February 24, 2025. 90 Fed. Reg. 10511, 10511 (Feb. 24, 2025). Contrary to statute, which prohibits ending a country's TPS designation before the date on which it was scheduled to expire (8 U.S.C. § 1254a(b)(3)(B)), the "partial

---

[94]    Transcript, *Meet the Press* (Nov. 30, 2025), https://www.nbcnews.com/meet-the-press/meet-press-november-30-2025-n1313101
[95]    Exec.    Order    14159    (Jan.    20,    2025),    *available    at* https://www.whitehouse.gov/presidentialactions/2025/01/protecting-the-american-people-against-invasion/.
[96]    *Id*.

vacatur" purported to end Haiti's TPS designation as of "August 3, 2025, instead of February 3, 2026," its previously fixed expiration date.  90 Fed. Reg. at 10511.

118.    According to the "partial vacatur," Secretary Noem acted "[i]n furtherance of" the objectives set forth in President Trump's executive order entitled "Protecting the American People Against Invasion," which she characterized as directing her "to promptly take all appropriate actions, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States."  90 Fed. Reg. at 10513.  The "partial vacatur" offered no explanation why prematurely ending Haiti's TPS designation in contravention of 8 U.S.C. § 1254a(b)(3)(B) is, supposedly, "consistent with law."  Rather, in the press statement announcing the partial vacatur, Secretary Noem stated that DHS was "returning integrity to the TPS system," and "returning TPS to its original status: temporary."[97]

119.    The "partial vacatur" did not purport to be a product of the mandatory review process set forth in 8 U.S.C. § 1254a(b)(3).  It did not claim that Secretary Noem "consult[ed] with appropriate agencies of the Government."  *Id.*  § 1254a(b)(3)(A).  Nor did it claim that she "review[ed] the conditions in" Haiti, let alone "determined whether the conditions for [Haiti's] designation … continue to be met." *Id.*

120.    Rather, Secretary Noem merely criticized her predecessor's most recent extension and redesignation decision.  According to Secretary Noem, "partial vacatur" of the July 1, 2024, extension and redesignation—which extended Haiti's TPS designation to February 3, 2026—was warranted because, in her view, it (1) contained "no discussion … of why the 18-month period was selected"; (2) lacked "justification of why permitting the ever-increasing population of Haitian

---

[97] Press Release, DHS, Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status

TPS recipients … to remain temporarily in the United States is not contrary to the U.S. national interest"; and (3) cited country conditions reports that "[d]ate back to early 2023" or earlier.  90 Fed. Reg. at 10513.

121.    Despite her criticisms of the July 1, 2024, extension and redesignation, Secretary Noem's "partial vacatur" did not do what the statute requires be done before Haiti's TPS designation could lawfully be terminated: She did not determine that it was now possible for Haitian TPS holders to return to Haiti "in safety."  Nor did she determine that the presence of Haitian TPS holders is "contrary to the national interest."  8 U.S.C. § 1254a(b)(3).

122.    Instead of engaging in the procedure required by statute for terminating a country's TPS designation, Secretary Noem purports to have "partially vacate[d]" the existing designation. 90 Fed. Reg. at 10511.  But the TPS statute does not contemplate vacatur of an existing designation. To the contrary, because the statute specifies a particular termination procedure, the Secretary may not bypass that procedure, whether by styling her decision a "vacatur" or otherwise.

123.    Moreover, even if she had conducted the requisite periodic review before issuing the "partial vacatur" and, as a result of that review, had determined that the statutory conditions for designation no longer exist, Secretary Noem still could not terminate Haiti's TPS designation before "the expiration of the most recent previous extension" (8 U.S.C. § 1254a(b)(3)(B)), which in this case is February 3, 2026.  89 Fed. Reg. at 54491.

124.    Ignoring duly enacted law, Secretary Noem prematurely ended Haiti's TPS designation at the behest of President Trump.[98]  Instead of giving due consideration to the statutorily identified factors after consultation with the appropriate agencies, she reached a

---

[98]    Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s ("When the President gives a directive, the Department of Homeland Security will follow it.") (last visited July 13, 2025).

predetermined decision, having earlier announced that "[w]hen the President gives a directive [to end a TPS designation], the Department of Homeland Security will follow it."[99]

125.    On July 1, 2025, Hon. Brian J. Cogan of the United States District Court for the Eastern District of New York held that Secretary Noem's "partial vacatur" of Haiti's TPS was unlawful.  *See generally Haitian Evangelical Clergy Ass'n et al. v. Trump*, 789 F. Supp. 3d 255 (E.D.N.Y. 2025).

126.    Judge Cogan ruled that Secretary Noem "does not have statutory or inherent authority to partially vacate a country's TPS designation" and that accordingly her purported "partial vacatur" of Haiti's TPS designation "must be set aside as unlawful" under the Administrative Procedure Act.  *Haitian Evangelical Clergy Ass'n*, 789 F. Supp. 3d at 273.

127.    Because Judge Cogan set aside the "partial vacatur" as unlawful, the original expiration date of Haiti's TPS designation is once again in effect.  As established by the July 2024 extension and redesignation that Secretary Noem purported to "partially vacate," Haiti's current TPS designation does not expire until February 3, 2026.  *See Haitian Evangelical Clergy Ass'n*, 789 F. Supp. 3d at 273.

<u>July 1, 2025 Termination</u>

128.    On June 27, 2025, Secretary Noem announced in a press release that Haiti's TPS would be terminated effective September 2, 2025.[100]

---

[99] Interview  with  Krisi  Noem,  Homeland  Security  Secretary,  CNN  (January  29,  2025), https://transcripts.cnn.com/show/cnc/date/2025-01-29/segment/12
[100]    *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status* (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status

129.    Notice of the termination was published in the Federal Register on July 1, 2025.  90 Fed. Reg. 28760 ("After September 2, 2025, nationals of Haiti … who have been granted TPS under Haiti's designation will no longer have TPS.").

130.    The unlawful July 1, 2025, termination of Haiti's TPS designation rested on the unlawful February 24, 2025, "partial vacatur" of Haiti's TPS designation.  As the government admitted with respect to Secretary Noem's February 2025, termination of Venezuela's TPS designation, "[t]he Secretary's vacatur was an essential prerequisite of her determination to terminate, rather than extend," Haiti's TPS designation. Stay Appl. at 18 n.12, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025).  Because 8 U.S.C. § 1254a(b)(3)(B) prohibits termination of a TPS designation before the end of its most recent extension, unlawfully vacating a country's most recent extension allows the administration to then, in a second action, unlawfully terminate the country's TPS designation earlier than otherwise allowed while nominally adhering to the statute's text.  In other words, the only reason Secretary Noem could—albeit falsely—claim authority to terminate Haiti's TPS designation effective September 2, 2025, is because she purported to "partially vacate" the July 1, 2024, notice that had extended Haiti's TPS designation through February 3, 2026.

131.    Because the "partial vacatur" on which it necessarily depends was "unlawful" (*Haitian Evangelical Clergy Ass'n*, 789 F. Supp. 3d at 273), Secretary Noem's termination of Haiti's TPS designation effective September 2, 2025, was itself unlawful.  Specifically, Secretary Noem's termination of Haiti's TPS designation effective September 2 is unlawful because it is premature.  As Judge Cogan correctly recognized, under "the statutorily prescribed timeline, … the next available date for termination of Haiti's TPS designation [is] February 3, 2026."  *Id*. at 270.

132.    Timing aside, Secretary Noem's termination of Haiti's TPS designation was unlawful in other ways.

133.    Secretary Noem appeared terminate Haiti's TPS designation based on her subjective belief that Haitians, as a population, have had TPS for too long. Both the press release announcing the termination and the Federal Register notice memorializing it confirm as much. The press release announcing her decision stated that terminating Haiti's TPS "ensures that Temporary Protected Status is actually temporary."[101] The Federal Register notice likewise states that TPS "is an inherently temporary status." 90 Fed. Reg. 28760.

134.    But that misreads the TPS statute. Although designations are for fixed time periods and subject to periodic review because the conditions for designation might eventually cease to exist, the statute places no limit on the number of times that a TPS designation can be extended or redesignated. So long as the periodic mandatory review finds that the conditions for designation continue to exist, the Secretary must extend the designation. 8 U.S.C. § 1254a(b)(3)(A). Indeed, under the statute, designations are automatically extended unless and until the Secretary affirmatively determines that the conditions for designation have ceased to exist. *Id.* § 1254a(b)(3)(A), (C).

135.    In addition to being contrary to the text of the TPS statute, Secretary Noem's focus on the supposed "inherently temporary" nature of a TPS designation, (90 Fed. Reg. 28760), was also a departure from longstanding DHS policy, which was to extend, redesignate, or terminate a TPS designation based on the Secretary's periodic review of the conditions in the foreign state

---

[101]    *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status* (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status

(rather than the Secretary's subjective beliefs about whether TPS holders have enjoyed TPS for too long).

136.    This departure from past policy, enacted *sub silentio* and without a "reasoned explanation" is itself arbitrary and capricious under the Administrative Procedure Act—particularly since DHS's "prior policy has engendered serious reliance interests" for TPS holders. *F.C.C. v. Fox Television Stations, Inc.*, 566 U.S. 502, 515 (2011); *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)); *cf. Haitian Evangelical Clergy Ass'n*, 789 F. Supp. 3d at 267 ("where a TPS extension is given, it creates important reliance interests" (cleaned up)).

137.    The July 1, 2025, Federal Register notice memorializing the termination of Haiti's TPS designation was also unlawful because it reports no determination whether it is safe for Haitian TPS holders to return to Haiti.  Under the TPS statute, Secretary Noem was *required* to "review the conditions in [Haiti]" and "determine whether the conditions for [Haiti's TPS] designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Haiti was designated for TPS under 8 U.S.C. § 1254a(b)(1)(C); Secretary Noem, therefore, was required to review whether there continue to be "conditions [in Haiti] that prevent [Haitians] from returning in safety," and had the option to also review whether permitting Haitian TPS holders to remain in the United States was in the "national interest" of the United States.  8 U.S.C. § 1254a(b)(1)(C).  Based on this review, she was then required to "determine whether the conditions" for Haiti's TPS designation "continue to be met" and to publish in the Federal Register not only her "determination" but "*the basis for the determination*."  8 U.S.C. § 1254a(b)(3)(A) (emphasis added).

138.    The July 1, 2025 Federal Register notice did not do this.  Although it stated that Secretary Noem reviewed "whether extraordinary and temporary conditions in Haiti that prevent aliens who are Haitian nationals from returning to Haiti in safety continue to exist," (90 Fed. Reg. 28762), it reported no determination whether Haitians can "return[] in safety."  8 U.S.C. § 1254a(b)(1)(C).  Instead, the entire basis for the termination in the Federal Register notice was Secretary Noem's conclusion that allowing Haitian TPS holders to stay in the United States is "contrary to the national interest," (90 Fed. Reg. 28762)—a consideration that, unlike the country condition review, is not mandatory. *See* 8 U.S.C. § 1254a(b)(1)(C), (b)(3)(A).

139.    Because the July 1, 2025 Federal Register notice does not report any determination whether it is safe for Haitian TPS holders to return to Haiti, much less "the basis for [such] determination," the July 1, 2025 Federal Register notice did not satisfy the TPS statute. 8 U.S.C. § 1254a(b)(3)(A).

140.    Moreover, the word "determination" for purposes of § 1254a(b)(3)(A) means a factual determination as to the existence or non-existence of the conditions for designation under § 1254a(b)(1).  The Secretary does not "determine" whether to extend or terminate a country's TPS designation; the only "determination" she makes is the factual determination regarding the existence or non-existence of the conditions for designation.  The supposed "decision" to terminate is neither a determination nor a decision—it is merely a ministerial result compelled by the Secretary's factual conclusion.  If the Secretary determines that the conditions for designation continue to exist, she must extend the designation. § 1254a(b)(3)(A) (the Secretary "shall provide on a timely basis for the publication of notice of each such determination … and, in the case of an affirmative determination, the period of extension of designation … in the Federal Register").  Conversely, if she determines that the conditions for designation no longer exist, then she must

terminate the designation.  *Id.* § 1254a(b)(3)(B) ("If the [Secretary] determines … that a foreign state … no longer continues to meet the conditions for designation …, the [Secretary] shall terminate the designation").  She has no discretion in the matter either way.  Moreover, as noted, whether the Secretary finds that the conditions for designation do or do not exist, she must publish notice of not only her determination but also "the basis for the determination." *Id*. at § 1254a(b)(3)(A)-(B).

141.    Thus, because the July 1, 2025 Federal Register notice did not say whether it was safe for Haitian TPS holders to return to Haiti, it failed to contain the mandatory "determination" with respect to country conditions.

142.    That (i) the July 1, 2025 termination of Haiti's TPS designation was premature and predicated on Secretary Noem's subjective belief that Haitians have had TPS for too long, and (ii) the Federal Register notice of the termination is statutorily deficient, not only made the July 1, 2025 termination unlawful for the reasons set out above, but also demonstrate that termination of Haiti's TPS designation was preordained and pretextual.

143.    In particular, that the July 1, 2025 termination was based on a "national interest" determination and not any determination of whether it is safe for Haitian TPS holders to return to Haiti itself suggests that Secretary Noem's review was not "purely evidence-based" as the statute requires.  *Saget*, 375 F. Supp. 3d at 346.  In other words, the absence of any determination concerning whether it is safe for Haitian TPS holders to return to Haiti itself suggests that Secretary Noem started from the conclusion that President Trump wanted—to end TPS for Haiti—and then worked backwards from that preferred result.  That is unlawful.  *See Saget*, 375 F. Supp. 3d at 362 (it is unlawful for officials to "reverse-engineer facts" in order to "justify termination").

144.    That Secretary Noem based her July 1, 2025 termination on the statute's "national interest" language also evidences that the termination was unlawful.  Until 2025, when the second Trump administration took power, *no* TPS designation for *any* country in the 35-year history of the TPS statute had *ever* been terminated based on "national interest."  But in President Trump's second term, four countries' TPS designations (including Haiti's) were terminated based exclusively or primarily on Secretary Noem's assessment of "national interest."  90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti).  This deviation from past practice is itself evidence of arbitrary and capricious agency action. *Fox Television Stations, Inc*., 566 U.S. at 515 (2011); *Encino Motorcars*, 579 U.S. at 222.

145.    The July 1, 2025 termination notice's focus on several of President Trump's executive orders is further evidence that the termination notice was unlawful.  *See Saget*, 375 F. Supp. 3d at 343 (evidence of improper political influence—such as "consider[ing] how the Haiti TPS decision fit into the White House's grander 'America First' strategy" and terminating the designation to "ensure[] agenda adherence" with the White House's political objectives—was evidence that the termination was arbitrary and capricious under the APA).

146.    Moreover, the July 1, 2025 termination notice's extensive focus on several of President Trump's executive orders as the basis for the termination suggests that the termination decision was in fact a product of President Trump's wishes—and that Secretary Noem did not reach the decision independently.

147.    The facts cited in the July 1, 2025 termination in support of Secretary Noem's "national interest" considerations are largely false.  That the termination rested on falsehoods is

evidence that the process undergirding the termination was a sham designed to create a pretext for termination TPS for Haiti.

148.    Secretary Noem's July 1, 2025 termination notice identified two reasons why it was supposedly against the "national interest" to allow Haitian TPS holders to remain in the United States: that TPS is generally bad because it encourages illegal Haitian migration to the United States, and that some unspecified percentage of Haitians are criminals.

149.    _**First**_, Secretary Noem's July 1, 2025 termination notice asserted that TPS is a "pull factor" for illegal migration to the United States from Haiti. 90 Fed. Reg. 28762.

150.    But Secretary Noem is wrong that TPS is a "pull factor" for illegal migration—and the very data on which she relies confirms as much.

151.    Secretary Noem asserts: "Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024." 90 Fed. Reg. 28762.

152.    But the data Secretary Noem cites are _not_ only from U.S. Border Patrol.  They are from _both_ U.S. Border Patrol (USBP) _and_ from U.S. Customs and Border Protection (CPB).

153.    USBP data includes only arrests of individual who enter the country _unlawfully_, between ports of entry.

154.    CPB data also includes individual who entered the country _lawfully_, through a port of entry and whose "encounter" was with CPB's Office of Field Operations.

155.    The full picture of the data on which Secretary Noem relied is below[102]:

| Fiscal Year | U.S. Border Patrol (between ports of entry) | Office of Field Operations (at ports of entry) |
|---|---|---|
| 2021 | 46,160 | 2,560 |
| 2022 | 30,850 | 25,740 |
| 2023 | 2,430 | 161,350 |
| 2024 | 2,790 | 218,010 |
| 2025 through January | 390 | 11,240 |
| TOTAL | 82,550 | 418,900 |

156.    These data show that, in reality, Haitian migrants largely stopped crossing the U.S.-Mexico border unlawfully in 2022.

157.    Monthly data show that this shift in crossing patterns first began in the summer of 2022, soon after DHS created a humanitarian exception process permitting some individual to access ports of entry to seek asylum despite the ongoing use of Title 42 (a pandemic-era public health policy which shuttered the ports of entry to asylum seekers in March 2020).

158.    Thus, the data show that—contrary to the July 1, 2025 termination notice—the Haitian migrant population in the U.S. today overwhelmingly entered lawfully. From 2021 through January 2025, 83.5% of all Haitians encountered by CBP have been encountered legally at ports of entry. From 2023 through January 2025, after lawful pathways became accessible to Haitian migrants, *98.9%* of CBP encounters of Haitians occurred at lawful ports of entry.

---

[102]    U.S. Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* Dec. 3, 2025; U.S. Customs and Border Protection, FY21 - FY24 Nationwide Encounters by Area of Responsibility, https://www.cbp.gov/sites/default/files/2024-10/nationwide-encounters-fy21-fy24-aor.csv.

159.    More recent data confirm these points. Haiti's current TPS designation began in the summer of 2024, when Secretary Mayorkas issued his redesignation and extension.  From July 2024 through January 2025, the USBP reported only 247 apprehensions of Haitian migrants—or an average of just 35 irregular entries per month.  These data do not support the assertion that TPS is a "pull factor" for illegal or irregular migration—especially when compared to the approximately 350,000 Haitian TPS holders lawfully present in the United States.

160.    Thus, the very data on which Secretary Noem relies show that the availability of TPS for Haiti is not a "pull factor" for illegal migration, as Secretary Noem falsely asserted in the July 1, 2025 termination notice.  That the termination notice manipulated the data in order to suggest otherwise is evidence that this rationale was pretextual and that the real reason for the termination was the Trump administration's preordained plan to terminate.

161.    ***Second***, Secretary Noem's July 1, 2025 termination notice asserts that allowing Haitian TPS holders to stay in the United States is contrary to the national interest because Haitian people in general are a threat to public safety.

162.    For example, the July 1, 2025 termination notice asserted that "Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes." 90 Fed. Reg. 28763.

163.    Echoing President Trump's false claims that predominantly nonwhite countries are "emptying their prisons and mental asylums" and "sending" criminals to the United States, the July 1, 2025 termination notice states that "rising Haitian migration" poses a "broad[] risk" to the public safety of the United States in part due to "large-scale prison breaks in Haiti."  90 Fed. Red.

28763.  Notably, however, the termination notice does not identify any Haitian TPS holder who escaped from a prison.

164.    Indeed, the July 1, 2025 termination notice never says anything about criminality rates for *Haitian TPS holders*.  It refers only to "Haitians" as criminals.  The implication of this rhetorical sleight-of-hand is that Haitians are, as a group, dangerous, and violent.  This stereotyping is consistent with President Trump's discriminatory rhetoric.

165.    In reality, research from across the political spectrum shows that immigrants in general are not criminals: immigrants are less likely to commit crimes than native-born Americans. Extensive research shows that "since the 1960's immigrants are 60% less likely to be incarcerated than U.S.-born people" and that even "undocumented immigrants were 37.1% less likely to be convicted of a crime."[103]   A 2024 study commissioned by the U.S. Department of Justice's National Institute of Justice and based on Texas criminal records showed that "undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter the rate of native-born citizens for property crimes."[104]

166.    The data concerning Haitians, as a group, are consistent with the research overall. An analysis of U.S. Census data by the libertarian CATO Institute showed that "[n]ative-born Americans have an incarceration rate 48 percent higher than that of all Haitian immigrants" and that even "Haitian illegal immigrants have an incarceration rate 81 percent below native-born Americans."[105]

---

[103]    Jasmine Garsd, *Immigrants are less likely to commit crimes than U.S.-born Americans, studies find*, NPR NEWS (March 8, 2024), https://www.npr.org/2024/03/08/1237103158/immigrants-are-less-likely-to-commit-crimes-than-us-born-americans-studies-find

[104]    U.S. Dep't of Just., Nat'l Inst. of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate* 1 (2024), https://docs.house.gov/meetings/JU/JU01/20250122/117827/HHRG-119-JU01-20250122-SD004.pdf

[105]    Alex Nowrasteh, *Haitian Crime in the United States. What Does the Evidence Say?*, CATO INSTITUTE (Oct. 5, 2021), https://www.cato.org/blog/haitian-crime-united-states-what-does-evidence-say

167.    In any event, by law TPS holders must have clean records in order to continue receiving TPS protections.  Individuals "convicted of any felony or two or more misdemeanors" are "not … eligible for temporary protected status" in the first place and the Secretary is required to "withdraw temporary protected status" if a TPS holder becomes ineligible by virtue of criminal activity.  8 U.S.C. § 1254a(c)(2)(B), (3)(A).

168.    The Government knows—or has the information it needs to know—how many TPS holders have lost their TPS because they committed crimes.

169.    Eligible immigrants are required to register or, for those already holding TPS, re-register with the government during each TPS registration period.  8 U.S.C. § 1254a(c)(1)(A)(iv); 8 U.S.C. § 1254a(c)(1)(A) (providing that TPS may be withdrawn to an individual alien if "the alien fails, without good cause, to register with [DHS] annually, at the end of each 12-month period after the granting of" TPS).

170.    The registration process involves submitting to an "extensive background check" to verify whether the registrant has committed any crimes.[106]  USCIS Form I-821—which those applying for TPS must complete and submit as part of the registration process—states that "USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the

---

[106] Aaron Reichlin-Melnick, *Temporary Protected Status: What's Up With That?,* AM. IMM. COUNCIL (Oct. 29, 2024), https://www.americanimmigrationcouncil.org/blog/temporary-protected-status-whats-up-with-that/; Catholic Legal Immigration Network, *Temporary Protected Status: Comprehensive Backgrounder*, (Jan. 7, 2019) ("All noncitizens from the designated country who are in the United States on the date of designation may then apply for and receive TPS if they meet the statutory requirements (including a criminal background check)."), https://www.cliniclegal.org/resources/humanitarian-relief/temporary-protected-status-comprehensive-backgrounder

Federal Bureau of Investigation (FBI), before making a decision on your application or petition."[107]

171.    Thus, if a TPS holder commits a crime such that he or she is no longer eligible for TPS, the government revokes his or her TPS status.

172.    Accordingly, Secretary Noem could have included in the July 1, 2025 termination notice data on how many Haitians have lost their TPS status because of criminality.  She did not do so.  That she did not suggests that the data fail to show appreciable criminality among Haitian TPS holders.

173.    The July 1, 2025 termination notice's only reference to supposed criminality among Haitian TPS holders offers no evidence of such criminality.  According to the notice, "DHS records indicate that there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."  90 Fed. Reg. at 28763. Notably, the notice does not state the number or outcome of any such investigations, much less claim that any of the alleged subjects of investigation were charged, much less convicted, of any crimes.   Once again, the notice's make-weight argument evidences the administration's determination to justify a predetermined outcome.

174.    Rather than provide data demonstrating how many Haitian TPS holders are criminals, the July 1, 2025 termination notice offers a single, anecdotal example meant to illustrate that Haitians, as a group, are dangerous: the case of Wisteguens Jean Quely Charles, a Haitian with numerous criminal convictions who was arrested in Boston in January 2025.  The termination notice says that Charles's case in particular "underscores the broader risk posed by rising Haitian migration."  90 Fed. Reg. 28763.

---

[107]    USCIS Form I-821, https://www.uscis.gov/sites/default/files/document/forms/i-821instr.pdf

175.    But as the termination notice itself states, Charles was convicted of numerous felonies, which means that he is, by statute, not eligible for TPS.  Notably, the July 1, 2025 termination notice does not say that Charles was a TPS holder—only that he is "Haitian."  Indeed, on information and belief, Charles was not a TPS holder during the time period identified in the July 1, 2025 termination notice.

176.    Charles's case, therefore, does not illustrate how continuing Haiti's TPS designation is contrary to the national interest.

177.    Secretary Noem's focus on supposed criminality was, moreover, a departure from prior DHS practice.  As former USCIS Director Leon Rodriguez explained in his testimony in *Saget*, DHS "did not consider crime rates among TPS recipients during his tenure as USCIS Director."  375 F. Supp. 3d at 300.  Director Rodriguez explained that "crime rates were not a factor because 'by definition, you do not qualify to receive TPS in the first place if you are a convicted criminal. And if you are convicted while you were on TPS, your TPS would ordinarily be terminated based on that conviction."  *Id*. (cleaned up).  Director Rodriguez went on: "If somebody is convicted of a crime while they are on TPS, ordinarily Immigrations and Customs Enforcement, which is the enforcement agency within the Department of Homeland Security, would initiate proceedings to terminate their TPS[ ] and then to potentially place that person in deportation proceedings." *Id*. at 300–01 (cleaned up).

178.    In short, the July 1, 2025 termination notice's two stated reasons why continuing Haiti's TPS is supposedly contrary to the national interest—that TPS incentivizes illegal migration and increases criminality—are both pretextual.

November 28, 2025 Termination

179.    On July 1, 2025—the same day that Secretary Noem published the notice terminating Haiti's TPS designation—the United States District Court for the Eastern District of New York held unlawful and set aside Secretary Noem's "partial vacatur" of Haiti's TPS designation.  *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255 (E.D.N.Y. 2018).  The effect of this ruling was to restore February 3, 2026 as the effective end-date of Haiti's TPS designation.

180.    On November 28, 2025, in response to the ruling in *Haitian Evangelical Clergy Association*, Secretary Noem published a "new, superseding" notice in the federal register terminating Haiti's TPS designation.  90 Fed. Reg. 54733.

181.    The November 28, 2025 termination notice is largely identical to the July 1, 2025 termination notice.

182.    As in the July 1, 2025 termination notice, Secretary Noem appears to have terminated Haiti's TPS designation based on her subjective belief that Haitians have had TPS for too long.  The November 28, 2025 termination notice reiterates that TPS "is an inherently temporary status."  90 Fed. Reg. at 54739.

183.    As in the July 1, 2025 termination notice, Secretary Noem's approach regarding the word "temporary" is contrary to the plain text of the statute:  Although designations are for fixed time periods and subject to periodic review because the conditions for designation might eventually cease to exist, the statute places no limit on the number of times that a TPS designation can be extended or redesignated.  So long as the periodic mandatory review finds that the conditions for designation continue to exist, the Secretary must extend the designation.  8 U.S.C. § 1254a(b)(3)(A).  Indeed, under the statute, designations are automatically extended unless and

until the Secretary affirmatively determines that the conditions for designation have ceased to exist. *Id.* § 1254a(b)(3)(A), (C).

184.    As with the July 1, 2025 termination notice, Secretary Noem's focus on the supposed "inherently temporary" nature of a TPS designation, (90 Fed. Reg. at 54739), is a departure from longstanding DHS policy, which was to extend, redesignate, or terminate a TPS designation based on the Secretary's periodic review of the conditions in the foreign state (rather than the Secretary's subjective beliefs about whether TPS holders have enjoyed TPS for too long). This departure from past policy, enacted *sub silentio* and without a "reasoned explanation" is itself arbitrary and capricious under the Administrative Procedure Act—particularly since DHS's "prior policy has engendered serious reliance interests" for TPS holders. *F.C.C. v. Fox Television Stations, Inc*., 566 U.S. 502, 515 (2011); *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)); *cf. Haitian Evangelical Clergy Ass'n*, 789 F. Supp. 3d at 267 ("where a TPS extension is given, it creates important reliance interests" (cleaned up)).

185.    Similar to the July 1, 2025 termination notice, the November 28, 2025 termination notice is based primarily on Secretary Noem's assessment that termination of Haiti's TPS designation is "required because it is contrary to the national interest of the United States to permit Haitian nationals … to remain temporarily in the United States."  90 Fed. Reg. at 54735.

186.    But as with the July 1, 2025 termination notice, that Secretary Noem based her termination on the statute's "national interest" language is itself evidence that the termination is unlawful.  Until 2025, when the second Trump administration took power, *no* TPS designation for *any* country in the 35-year history of the TPS statute had *ever* been terminated based on "national

interest."  But in President Trump's second term, four countries' TPS designations (including Haiti's) were terminated based exclusively or primarily on Secretary Noem's assessment of "national interest."  90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti).  This *sub silentio* deviation from past practice is itself evidence of arbitrary and capricious agency action. *Fox Television Stations, Inc*., 566 U.S. at 515 (2011); *Encino Motorcars*, 579 U.S. at 222.

187.    As with the July 1, 2025 termination notice, the November 28, 2025 termination notice's reliance on President Trump's executive orders is further evidence that the termination notice is unlawful.  *See Saget*, 375 F. Supp. 3d at 343 (evidence of improper political influence— such as "consider[ing] how the Haiti TPS decision fit into the White House's grander 'America First' strategy" and terminating the designation to "ensure[] agenda adherence" with the White House's political objectives—was evidence that the termination was arbitrary and capricious under the APA); *accord Tummino v. Torti*, 603 F. Supp. 2d 519, 544-45 (E.D.N.Y. 2009) ("the mere existence of 'extraneous pressure' from the White House or other political quarters would render [the agency's] decision invalid" under the APA" (quoting *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49) (D.C. Cir. 1971)).

188.    Moreover, as with the July 1, 2025 termination notice, the November 28, 2025 termination notice's extensive focus on several of President Trump's executive orders as the basis for the termination suggests that the termination decision was in fact a product of President Trump's wishes—and that Secretary Noem did not reach the decision independently.

189.    As with the July 1, 2025 termination notice, the facts cited in the November 28, 2025 termination notice in support of Secretary Noem's "national interest" considerations are

largely false.  That the termination rests on falsehoods is evidence that the process undergirding the termination was a sham designed to create a pretext for termination TPS for Haiti.

190.    Secretary Noem's November 28, 2025 termination notice repeats two of the same reasons set forth in the July 1, 2025 termination notice for why it is supposedly against the "national interest" to allow Haitian TPS holders to remain in the United States: (1) that TPS is generally bad because it encourages illegal Haitian migration to the United States, and (2) that some unspecified percentage of Haitians are criminals.  It adds a third reason not present in the July 1, 2025 notice: that certain Haitian nationals present in the United States are supporters of the gangs currently wreaking havoc in Haiti.

191.    *__First__*, just as in the July 1, 2025 termination notice, Secretary Noem's November 28, 2025 termination notice asserts that TPS is a "pull factor" for illegal migration to the United States from Haiti.  90 Fed. Reg. at 54736-37.

192.    As in the July 1, 2025 notice, Secretary Noem asserts that because of Haiti's TPS designation "there has been a significant increase" in the number of Haitians arriving in the United States illegally.  90 Fed. Reg. at 54736.

193.    Relying on the very same data as in the July 1, 2025 notice, Secretary Noem asserts: "Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024."  90 Fed. Reg. at 54736.

194.    But, as in the July 1, 2025 notice, the data Secretary Noem cites are *not* only from U.S. Border Patrol.  They are from *both* U.S. Border Patrol (USBP) *and* from U.S. Customs and Border Protection (CPB).  USBP data includes only arrests of individual who enter the country

*unlawfully*, between ports of entry.  CPB data also includes individual who entered the country

*lawfully*, through a port of entry and whose "encounter" was with CPB's Office of Field Operations.

195.    The full picture of the data on which Secretary Noem relied is below[108]:

| Fiscal Year | U.S. Border Patrol (between ports of entry) | Office of Field Operations (at ports of entry) |
|---|---|---|
| 2021 | 46,160 | 2,560 |
| 2022 | 30,850 | 25,740 |
| 2023 | 2,430 | 161,350 |
| 2024 | 2,790 | 218,010 |
| 2025 through January | 390 | 11,240 |
| TOTAL | 82,550 | 418,900 |

196.    These data show that, in reality, Haitian migrants largely stopped crossing the U.S.-

Mexico border unlawfully in 2022.

197.    Monthly data show that this shift in crossing patterns first began in the summer of

2022, soon after DHS created a humanitarian exception process permitting some individual to

access ports of entry to seek asylum despite the ongoing use of Title 42 (a pandemic-era public

health policy which shuttered the ports of entry to asylum seekers in March 2020).

198.    Thus, the data show that—contrary to the termination notice—the Haitian migrant

population in the U.S. today overwhelmingly entered lawfully.  From 2021 through January 2025,

*83.5%* of all Haitians encountered by CBP have been encountered legally at ports of entry.  From

---

[108]    U.S.    Customs    and    Border    Protection,    *Nationwide    Encounters*,
https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* Dec. 3, 2025; U.S. Customs and Border
Protection,    FY21  -  FY24    Nationwide    Encounters    by    Area    of    Responsibility,
https://www.cbp.gov/sites/default/files/2024-10/nationwide-encounters-fy21-fy24-aor.csv.

2023 through January 2025, after lawful pathways became accessible to Haitian migrants, **98.9%** of CBP encounters of Haitians occurred at lawful ports of entry.

199.    More recent data confirm these points. Haiti's current TPS designation began in the summer of 2024, when Secretary Mayorkas issued his redesignation and extension. From July 2024 through January 2025, the USBP reported only **247** apprehensions of Haitian migrants—or an average of just 35 unlawful entries per month.  These data do not support the assertion that TPS is a "pull factor" for illegal migration—especially when compared to the approximately 350,000 Haitian TPS holders lawfully present in the United States.

200.    Thus, as with the July 1, 2025 termination notice the very data on which Secretary Noem relies in the November 28, 2025 termination notice show that the availability of TPS for Haiti is not a "pull factor" for illegal migration, as Secretary Noem falsely asserts in the termination notice.  That the termination notice manipulates the data in order to suggest otherwise is evidence that this rationale is pretextual and that the real reason for the termination was the Trump administration's preordained plan to terminate.

201.    *Second*, just as in the July 1, 2025 termination notice, the November 28, 2025 termination notice asserts that allowing Haitian TPS holders to stay in the United States is contrary to the national interest because Haitian people in general are a threat to public safety.

202.    For example, copying the same language as the July 1, 2025 termination notice, the November 28, 2025 termination notice asserts that "Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes."  90 Fed. Reg. at 54737.

203.    Again copying the same language from the July 1, 2025 termination notice, the November 28, 2025 termination notice reiterates false claims that predominantly nonwhite countries are "emptying their prisons and mental asylums" and "sending" criminals to the United States.  *See* 90 Fed. Red. 54737.  Notably, however, as with the July 1, 2025 termination notice, the November 28, 2025 termination notice does not identify any Haitian TPS holder who escaped from a prison.

204.    Indeed, like the July 1, 2025 termination notice, the November 28, 2025 termination notice never says anything about criminality rates for *Haitian TPS holders*.  It refers only to "Haitians" generally as criminals.  The implication of this rhetorical sleight-of-hand is that Haitians are, as a group, dangerous, and violent.  This stereotyping is consistent with President Trump's discriminatory rhetoric.

205.    In reality, research from across the political spectrum shows that immigrants in general are not criminals: immigrants are less likely to commit crimes than native-born Americans. Extensive research shows that "since the 1960's immigrants are 60% less likely to be incarcerated than U.S.-born people" and that even "undocumented immigrants were 37.1% less likely to be convicted of a crime."[109]  A 2024 study commissioned by the U.S. Department of Justice's National Institute of Justice and based on Texas criminal records showed that "undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter the rate of native-born citizens for property crimes."[110]

---

[109]    Jasmine Garsd, *Immigrants are less likely to commit crimes than U.S.-born Americans, studies find*, NPR NEWS (March 8, 2024), https://www.npr.org/2024/03/08/1237103158/immigrants-are-less-likely-to-commit-crimes-than-us-born-americans-studies-find

[110]    U.S. Dep't of Just., Nat'l Inst. of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate* 1 (2024), https://docs.house.gov/meetings/JU/JU01/20250122/117827/HHRG-119-JU01-20250122-SD004.pdf

206.    The data concerning Haitians, as a group, are consistent with the research overall. An analysis of U.S. Census data by the libertarian CATO Institute showed that "[n]ative-born Americans have an incarceration rate 48 percent higher than that of all Haitian immigrants" and that even "Haitian illegal immigrants have an incarceration rate 81 percent below native-born Americans."[111]

207.    In any event, by law TPS holders must have clean records to maintain their TPS status. Individuals "convicted of any felony or two or more misdemeanors" are "not … eligible for temporary protected status" in the first place and the Secretary is required to "withdraw temporary protected status" if a TPS holder becomes ineligible by virtue of criminal activity. 8 U.S.C. § 1254a(c)(2)(B), (3)(A).

208.    The Government knows—or has the information it needs to know—how many TPS holders have lost their TPS because they committed crimes.

209.    Eligible immigrants are required to register or, for those already holding TPS, re-register with the government during each TPS registration period. 8 U.S.C. § 1254a(c)(1)(A)(iv); 8 U.S.C. § 1254a(c)(1)(A) (providing that TPS may be withdrawn to an individual alien if "the alien fails, without good cause, to register with [DHS] annually, at the end of each 12-month period after the granting of" TPS).

210.    The registration process involves submitting to an "extensive background check" to verify whether the registrant has committed any crimes.[112] USCIS Form I-821—which those

---

[111]    Alex Nowrasteh, *Haitian Crime in the United States. What Does the Evidence Say?*, CATO INSTITUTE (Oct. 5, 2021), https://www.cato.org/blog/haitian-crime-united-states-what-does-evidence-say

[112]    Aaron Reichlin-Melnick, *Temporary Protected Status: What's Up With That?*, AM. IMM. COUNCIL (Oct. 29, 2024), https://www.americanimmigrationcouncil.org/blog/temporary-protected-status-whats-up-with-that/; Catholic Legal Immigration Network, *Temporary Protected Status: Comprehensive Backgrounder*, (Jan. 7, 2019) ("All noncitizens from the designated country who are in the United States on the date of designation may then apply for and receive TPS if they meet the statutory requirements (including a criminal background check)."), https://www.cliniclegal.org/resources/humanitarian-relief/temporary-protected-status-comprehensive-backgrounder

applying for TPS must complete and submit as part of the registration process—states that "USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition."[113]

211.   Thus, if a TPS holder commits a crime such that he or she is no longer eligible for TPS, the government revokes his or her TPS status.

212.   Accordingly, Secretary Noem could have included in her November 28, 2025 termination notice data on how many Haitians have lost their TPS status because of criminality. She did not do so.  That she did not suggests that the data fail to show appreciable criminality among Haitian TPS holders.

213.   Like the July 1, 2025 termination notice, the November 28, 2025 termination notice's only reference to supposed criminality among Haitian TPS holders offers no evidence of such criminality.  According to the notice, "DHS records indicate that there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." 90 Fed. Reg. at 54737.  Notably, the notice does not state the number or outcome of any such investigations, much less claim that any of the alleged subjects of investigation were charged, let alone convicted, of any crimes.  Once again, the notice's make-weight argument evidences the administration's determination to justify a predetermined outcome.

214.   Rather than provide data demonstrating how many Haitian TPS holders are criminals, the November 28, 2025 termination notice, like the July 1, 2025 termination notice,

---

[113]   USCIS Form I-821, https://www.uscis.gov/sites/default/files/document/forms/i-821instr.pdf

offers a single, anecdotal example meant to illustrate that Haitians, as a group, are dangerous: the case of Wisteguens Jean Quely Charles, a Haitian with numerous criminal convictions who was arrested in Boston in January 2025. The termination notice says that Charles's case in particular "underscores the broader risk posed by rising Haitian migration." 90 Fed. Reg. at 54737.

215.    But as the November 28, 2025 termination notice itself states, Charles was convicted of numerous felonies, which means that he is, by statute, not eligible for TPS. Notably, the notice does not say that Charles was a TPS holder at the time of his crimes—only that he is "Haitian." Indeed, on information and belief, Charles was not a TPS holder during the time period identified in the November 28, 2025 termination notice.

216.    Charles's case, therefore, does not illustrate how continuing Haiti's TPS designation contributes to criminality.

217.    Secretary Noem's focus on supposed criminality is, moreover, a departure from prior DHS practice. As former USCIS Director Leon Rodriguez explained in his testimony in *Saget*, he "did not consider crime rates among TPS recipients during his tenure as USCIS Director." 375 F. Supp. 3d at 300. Director Rodriguez explained that "crime rates were not a factor because 'by definition, you do not qualify to receive TPS in the first place if you are a convicted criminal. And if you are convicted while you were on TPS, your TPS would ordinarily be terminated based on that conviction." *Id*. (cleaned up). Director Rodriguez went on: "If somebody is convicted of a crime while they are on TPS, ordinarily Immigrations and Customs Enforcement, which is the enforcement agency within the Department of Homeland Security, would initiate proceedings to terminate their TPS[ ] and then to potentially place that person in deportation proceedings." *Id*. at 300–01 (cleaned up).

218.    Plaintiffs' original complaint, filed nearly three months before the November 28, 2025 termination notice, identified each of the foregoing factual errors in the July 1, 2025 termination notice. The fact that the November 28, 2025 termination notice repeats those errors is itself evidence that the stated rationale for the termination is pretextual

219.    ***Third***, the November 28, 2025 termination notice contains an additional basis for its national interest rationale that was not present in the July 1, 2025 termination notice: that certain Haitian nationals in the United States are "linked to" the gangs currently wreaking havoc in Haiti. 90 Fed. Reg. at 54738.  The November 28. 2025 termination notice states that these nationals "pose not just an overseas threat but a tangible national security and public safety risk within our borders." *Id*.

220.    The termination notice points to two examples on this front.  First, "U.S. lawful permanent residents who were found to be affiliated" with the Haitian gang Viv Ansanm.  90 Fed. Reg. at 54738.  Second, a "Haitian alien who"—according to the government—"engaged in a campaign of violence and gang support that contributed to Haiti's destabilization." *Id*.  Neither example helps the government.

221.    As to the first example, the fact that the termination notice refers to "lawful permanent residents" and not TPS holders confirms the pretextual nature of the notice.  TPS provides no path to citizenship—so the fact that the November 28, 2025 termination notice invokes lawful permanent residents only reinforces that the administration's concern is with "Haitians" and not "Haitian TPS holders."  Not only is the example inapposite but neither the November 28, 2025 termination notice nor the source it cites identities any those lawful permanent residents who support Viv Ansanm.  *See* 90 Fed. Reg. at 54738 at n. 43.  It is thus impossible to know whether the government's assertion is true.

222.    The second example, the "Haitian alien" who allegedly supported Haitian gangs refers to Dimitri Vorbe.  90 Fed. Reg. 24738 n. 44.  Vorbe is not a typical TPS holder; he is instead a "prominent Haitian businessman"—one of Haiti's "so-called oligarchs."  And "U.S. authorities" have not "offer[ed] any proof to back up their claim" that he has fomented violence in Haiti, an accusation he denies.  In any event, "[t]his is the second time that Vorbe" has been detained in the United States—he was first arrested by ICE in 2020 on allegations that he overstayed his visa, and "[s]ince then, U.S. authorities have had possession of his Haitian passport while his case has been making its way through immigration court."[114]  Put simply:  the administration has known of Vorbe for years because his case has been working its way through immigration court for years. The administration could have included his case in the July 1, 2025 termination notice but did not do so.  That, in turn, suggests that the inclusion of his case in the November 28, 2025 termination notice is more pretextual backfill to support the preordained decision to terminate Haiti's TPS designation.

223.    In both instances, the November 28, 2025 termination notice confirms that the administration already has at its disposal the tools it needs to identify and remove alleged threats to national security: the unnamed lawful permanent aliens are subject to removal "under section 237(a)(4)(C) of the Immigration and Nationality Act" and Vorbe is "in ICE custody pending removal proceedings."  The November 28, 2025 termination notice never connects the dots and explains why terminating Haiti's TPS designation is necessary to removing individual criminals who by virtue of their criminality are not eligible for TPS.  Indeed, the TPS statute itself already

---

[114]  Jacqueline Charles, *ICE arrests Haitian businessman in Miami, while administration cancels visas in Haiti*, Miami Herald (Sept. 25, 2025), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article312233775.html

gives the government the ability to terminate individuals' TPS if they constitute a national security threat.  8 U.S.C. § 1254a(c)(2)(B)(ii).

224.    In short, the termination notice's stated reasons why continuing Haiti's TPS is supposedly contrary to the national interest are all pretextual.

225.    The November 28, 2025 termination notice—unlike the July 1, 2025 notice—also states that Haitians can now "return[] in safety."  90 Fed. Reg. at 54735.  The falsity of that statement is shown by other statements in the termination notice, including that: (1) "approximately 12% of Haiti's population" has been "forced to flee their homes and are internally displaced due to escalating violence and gang violence that has 'engulfed' Port-au-Prince 'and spreads beyond'" and (2) that as recently as October 28, 2025 there continue to be "gangs that are terrorizing communities, extorting families, [and] recruiting children to commit horrors." Fed. Reg. at 54735 (citations omitted).  These facts, admitted by Secretary Noem in the very termination notice, demonstrate that Haitians *cannot* return in safety

226.    The closest the November 28, 2025 termination notice comes to actually supporting its statement that Haiti is now safe for TPS holders is one line: that the "data surrounding internal relocation does indicate parts of the country are suitable to return to."  90 Fed. Reg. 54735.  But not only does the termination notice never identify which parts of the country are supposedly "suitable," the legal standard is not "suitability"—it is "safety."

227.    Indeed, even assuming that the statement "parts of the country are suitable to return to" could be construed as a statement that parts of Haiti are safe to return to, that statement would be flatly contradicted by the government's own State Department, which advises individuals to "not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited healthcare;" noting that "Haiti has been under a State of Emergency since March 2024" and that "[c]rimes

involving firearms are common in Haiti," including "robbery, carjackings, sexual assault, and kidnappings for ransom."[115]  On November 19, 2025—just days before Secretary Noem re-terminated Haiti's TPS designation—U.S. Deputy Secretary of State Chrisopher Landau posted online that gang violence in Haiti has recently "escalated."[116]  Thus, according to the government itself, the situation in Haiti is becoming less safe.  These contradictions underscore the pretextual nature of the decision to terminate Haiti's TPS designation.

228.    And though it is most pronounced in Haiti's capital city of Port-au-Prince, where gangs control an estimated 90% of the territory,[117] the violence is by no means confined to the capital.  In 2025, "[g]angs' territorial expansion has reached unprecedented levels and continues to advance."[118]  "During the third quarter of 2025" gang violence "continued to spread to the peripheral and rural areas of Port-au-Prince, as well as to the Artibonite and Centre departments."[119]  Indeed, Haitian police estimate that, as of December 1, 2025, "50% of the Artibonite region had fallen under gang control" following "large-scale attacks targeting towns including Bercy and Post-Sonde."[120]  Put simply, in recent months, not just the capital but "rural

---

[115] Travel Advisory: Haiti, U.S. Dept. of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html?gad_source=1&gad_campaignid=44031958015&gclid=Cj0KCQjw4qHEBhCDARIsALYKFNMYgiXJO6vJBxqwyd5WE0eBkljwcoBVZpnrv6RFdLQPI1AN5c2rfwQaAo1hEALw_wcB

[116] Christopher Landau, (@DeputySecState) X (Nov. 19, 2025), https://x.com/DeputySecState/status/1991271188903952889 (last visited Dec.4, 2025).

[117] *Haiti's gangs have 'near-total control' of the capital as violence escalates, UN says*, ASSOCIATED PRESS (July 2, 2025), https://apnews.com/article/un-haiti-gangs-capital-violence-government-kenya-c14dd55725e2e415b794ab88b4184e65.

[118] *From Criminal Governance to Community Fragmentation, supra* note 2.

[119] BINUH, *supra* note 5.

[120] Junior Racine, Danica Coto, and Evens Sanon, *Gangs launch large-scale attack in Haiti's central region as hundreds flee gunfire and burning homes*, ASSOCIATED PRESS (Dec. 1, 2025), https://apnews.com/article/haiti-gangs-attack-pont-sonde-bercy-gran-grif-4a3a091383202babec7939b630c1691e.

communities have increasingly become targets of indiscriminate attacks." [121]    These facts underscore the pretextual nature of the decision to terminate Haiti's TPS designation.

229.    The November 28, 2025 termination notice—quoting the U.N. Secretary General— states that there are "emerging signals of hope" for Haiti.  90 Fed. Reg. at 54735.  But the same U.N. source that the termination notice cites further quotes the Secretary General stating that Haiti is in a "perfect storm of suffering" and that "[s]tate authority is crumbling across Haiti while gang violence engulfs the capital … and beyond."  The Secretary General further described conditions in Haiti as "a life-and-death emergency."[122]  Indeed, this source confirms how unsafe conditions in Haiti are, not that conditions are improving.  That Secretary Noem cherrypicked a lone statement that advances her preferred policy while ignoring numerous contradictory statements demonstrates the pretextual nature of the decision to terminate Haiti's TPS designation.

230.    In any event, the "emerging signal of hope" to which Secretary Noem refers in the November 28, 2025 termination notice is a U.N.-created "Gang Suppression Force," (GSF) which, if it comes to fruition, is intended to "work in close coordination with the Haitian National Police (HNP) and the Haitian armed forces to conduct intelligence-led operations to neutrali[z]e gangs, provide security for critical infrastructure and support humanitarian access."  90 Fed. Reg. at 54735 (citation omitted).  In theory, "[t]he 5,550-strong force will also protect vulnerable groups, support reintegration of former fighters and help strengthen Haitian institutions."  *Id*.  According to the termination notice, terminating Haiti's TPS designation is required in order to not send mixed

---

[121]  Haiti,    Global    Centre    for    the    Responsibility    to    Protect    (Nov.    14,    2025), https://www.globalr2p.org/countries/haiti/#:~:text=Since%20the%20assassination%20of%20President,and%20humanitarian%20organizations%2C%20has%20increased.
[122]  United Nations, *"'The people of Haiti are in a perfect storm of suffering,' warns UN chief,"* (Aug. 28, 2025), https://news.un.org/en/story/2025/08/1165738.

signals concerning America's support for the GSF.  "The United States," it says, "cannot call for bold change on the ground while signaling doubt from afar." 90 Fed. Reg. at 94738.

231.    But the GSF itself is speculative and pretextual.  The GSF has not yet been deployed to Haiti, and will not be deployed to Haiti until at least the summer of 2026, if ever.  According to the UN itself, the GSF will be funded by "voluntary contributions" so questions remain, including "Where is the money going to come from? Where are the people going to come from? And how long will it take?" Critically, the Trump administration, which "pushed for" the GSF "refuses to continue bearing the brunt of the force's costs."[123]

232.    In short, the GSF exists in name only.  No forces have been deployed to Haiti and it is unclear whether they ever will be deployed.  Invoking the GSF is—at best—mere speculation that Haiti may, hopefully, one day, be safe.  It is not support for the legally relevant question: whether Haiti *is* safe *now*.

233.    Secretary Noem's invocation of America's commitments to the U.N.-backed GSF as a basis to terminate TPS for Haitians, moreover, is difficult (if not impossible) to reconcile with the U.N.'s issuance in 2022 of a "non-return advisory" for Haiti, which—citing the principle of anti-refoulement that is foundational to international law—called on all nations to suspend forced return of Haitian nationals.[124]  And, according to a July 4, 2025 statement by U.N. Haiti expert Bill O'Neill, "The human rights situation in Haiti is catastrophic by any measure. In my 30 years working in, and on, the country, I have never seen this level of sustained violence and fear.  There

---

[123] Daniela Mohor, *Haiti-in-depth*, THE NEW HUMANITARIAN (Dec. 3, 2026), https://www.thenewhumanitarian.org/analysis/2025/12/03/haiti-depth-new-gang-suppression-force-what-it-means-haiti
[124] UNHCR, *UNHCR calls on states to refrain from forced returns of Haitians* (Nov. 3, 2022), https://www.unhcr.org/us/news/press-releases/unhcr-calls-states-refrain-forced-returns-haitians

is currently no possibility for a safe, dignified and sustainable return of Haitians who are abroad. If anything, their country is much more dangerous than the one they fled."[125]

234.    It is, moreover, a non-sequitur to say that Haiti's TPS designation must be terminated so as to "align" America's immigration policy with its support for the GSF.  The very reason the GSF is needed is because Haiti is unsafe.  America's statutorily defined immigration policy is to extend a country's TPS designation when conditions in the country prevent its nationals "from returning … in safety."  8 U.S.C. § 1254a(b)(1)(C).  Extending Haiti's TPS designation is therefore entirely consistent with support for the GSF.  Indeed, if it were safe to return to Haiti, there would be no need for the GSF.

235.    Accordingly, invoking the U.N. and the practically nonexistent GSF as a basis to terminate Haiti's TPS is yet more pretext by Secretary Noem and the Trump administration.

## President Trump's Unlawful Attempt to Terminate Haiti's TPS During His First Administration

236.    President Trump's attempt to terminate Haiti's TPS is nothing new.  He attempted to do so during his first administration.

237.    As now, President Trump's first attempt to terminate Haiti's TPS was unlawful because it was preordained and pretextual.  It accordingly was enjoined by a federal district court which concluded (among other things) that the termination decision violated the Administrative Procedure Act and the Equal Protection Clause of the Fifth Amendment.  *See generally Saget*, 375 F. Supp. 3d 280.

---

[125] States should not return anyone to Haiti – UN expert Bill O'Neill, United Nations (July 4, 2025), https://www.ohchr.org/en/statements-and-speeches/2025/07/states-should-not-return-anyone-haiti-un-expert-bill-oneill?utm_source=chatgpt.com

238.    In November 2017, President Trump's Acting Secretary of Homeland Security, Elaine Duke, announced in a press release that TPS for Haiti would be terminated.  *Saget*, 375 F. Supp. 3d at 327–28.

239.    The Federal Register Notice for the termination contained three short paragraphs listing Acting Secretary Duke's rationale for termination.  Citing the Haitian President's intention to "rebuild Haiti's National Palace" and finding that "cholera is … at its lowest level since the outbreak began," Acting Secretary Duke determined "that the conditions for the designation of Haiti for TPS under 244(b)(1)(C) of the INA. 8 U.S.C. 1254a(b)(1)(C), are no longer met."  83 Fed. Reg. 2648, 2650.

240.    A group of Haitian TPS holders sued, asserting claims against President Trump, Acting Secretary Duke, and other administration officials.  The complaint alleged, among other things, that the termination decision violated both the Fifth Amendment's equal protection clause and the Administrative Procedure Act.

241.    Following a week-long hearing during which numerous witnesses testified and thousands of pages of exhibits were introduced, the court agreed, issuing a lengthy decision enjoining the termination of Haiti's TPS designation.  The evidence presented at the hearing included deposition testimony from DHS officials, email communications of both career officials and Trump administration political appointees, and decision memoranda concerning country conditions in Haiti drafted by career USCIS employees but then edited by political appointees to make conditions appear safe for Haitian returnees.  *See Saget*, 375 F. Supp. 3d at 301–27.

242.    Among many other things, the court concluded that the "sequence of events leading up to the decision to terminate Haiti's TPS was a stark departure from ordinary procedure,

suggestive of a pre-determined outcome not anchored in an objective assessment, but instead a

politically motivated agenda." *Saget*, 375 F. Supp. 3d at 372.  For example, the Court found that

> [t]he evidence shows DHS officials pushed back on drafts 'weighted for extension'
> because extension 'was not the conclusion [they were] looking for.' DHS officials
> directed USCIS officials to '[b]e creative' in finding 'positive data on the current
> status of Haiti to bolster the recommendation to terminate TPS.' Plaintiffs offer
> evidence that DHS and USCIS officials departed from prior practice by changing
> their interpretation of the TPS statute because the new interpretation would better
> support termination.

*Id.* at 343 (citations omitted, alterations in original).  The Court also pointed to Acting Secretary

Duke's supposed "'[r]ationale' for terminating TPS," reciting handwritten notes in which she

acknowledged not knowing of a proper basis for terminating Haiti's designation but nevertheless

avowed a "'need to rationalize conflicting info'" because "'all agree [TPS] must end.'"  *Id.* at 324

(citations omitted, alterations in original).

243.    Ultimately, the Court concluded that the plaintiffs had "proffered significant

evidence based on hard facts" that "the Government's decision was pretextual," with the evidence

"tending to show DHS, USCIS, and the Department of State reverse engineered the TPS process

with the principal aim of 'getting to no.'"  *Id.* at 343.  Put simply: "[T]he reasons motivating

[Acting Secretary Duke's] decision were not those articulated in the Federal Register Notice.  *Id.*

at 361–62.

244.    As to the plaintiffs' Equal Protection claim, the Court found that the evidence

showed "direct evidence of direct communications and involvement between the White House and

DHS in formulating the decision to terminate Haiti's TPS."  375 F. Supp. 3d at 369.  The Court

found that those communications "reveal[ed] the intent to formulate a general policy of terminating

TPS for predominantly non-white foreign countries in order to decrease the presence of non-white

immigrants in the United States."  375 F. Supp. 3d at 374.  The Court observed that "[u]nlike prior

decisions on TPS, the White House was not only involved in but was influential in producing the

decision to terminate TPS for Haiti." *Id*.  The White House's influence on the TPS decision-making process, coupled with President Trump's repeated invective against Haitians in particular and immigrants generally, caused the Court to conclude that

> [b]ased on the facts on this record, and under the factors prescribed by [the Supreme Court's decision in] *Arlington Heights*, there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.

*Id*. at 374.

245.    The government appealed the Court's ruling, but before the circuit court issued its ruling, Secretary Mayorkas designated Haiti for TPS in August 2021.  86 Fed. Reg. 41863 (Aug. 3, 2021).  That mooted the case, and the parties agreed to a stipulated dismissal.

### The Extraordinary Harms Haitian TPS Holders Will Suffer Because of the Termination

246.    Plaintiff Fritz Emmanuel Lesly Miot is reasonably fearful that, if forced to return to Haiti, he will die. He needs insulin to survive. Yet in Haiti, he would not have ready access to insulin, or to the specialists he needs to treat his diabetes, due to Haiti's non-functional healthcare system.    Moreover, Mr. Miot's diabetes leaves him more vulnerable to serious medical consequences from diseases that are prevalent in Haiti but not the United States, such as cholera, malaria, and dengue fever.  He would also be vulnerable to kidnapping and robbery by the gangs that currently hold sway in Haiti; those gangs view anyone who has spent time in the United States as a target, because they believe that people who spent time in the United States have money.

247.    Plaintiff Rudolph Civil is reasonably fearful that, if forced to return to Haiti, he would soon be kidnapped or killed.  Because he is culturally American, he will stick out in Haiti; for example, his Haitian Creole is very rusty because he does not speak it very much.  That would make him a target for gang kidnapping.  His family members have been targeted by gangs as well,

making him fearful that he would be targeted too.  In 2023, his father was attacked by a man who broke into his father's house and twice tried to shoot and kill his father; but both times the gunman's gun jammed, so the gunman hit his father over the head with the gun and stole his father's phone and other valuables.  His cousin, a young woman in her mid-twenties, was in the house with his father when this happened, and the gunman abducted her from the house.  He would not be able to find employment in Haiti; there are no jobs for computer engineers.  He is also concerned with catching the diseases that are common in Haiti.  Nor does he have a plan for stable housing—he cannot move in with his father because, as mentioned, his father is already a target of gang violence.

248.    Plaintiff Marlene Gail Noble is reasonably fearful that, if forced to return to Haiti, she will be unable to get treatment for her health issues (namely, her diagnosis of kyphosis in spinal tuberculosis) because Haiti does not have a functional health care system.  Because she has been in the United States for the last 34 years, she does not know anyone in Haiti; in fact, she cannot name a single person she knows in Haiti. Additionally, she does not speak, nor can she understand, French or Haitian Creole, the official languages of Haiti. She would be vulnerable to kidnapping and being held for a money ransom because people perceived as American by Haitian gangs are targeted. For the same reason, she could even be murdered.  She fears that, upon being forced to return to Haiti, she would be unable to find a home and resources or food.

249.    Plaintiff Marica Merline Laguerre is reasonably concerned for her safety if she is forced to return to Haiti.  She already has sleepless nights at the prospect of having to return to Haiti, a country where she has not lived since she was a year old.  She does not speak Haitian Creole well.  She is aware of how chaotic Haiti is right now; her uncle's house burned down and her uncle is now homeless.  A different uncle had his business seized by gangs, who threatened

him and his family and stole all of the food, goods, and merchandise in the business. She knows that the gangs rape women, kidnap people and hold them for ransom, and kill or otherwise abuse people, and that the police are ineffective and cannot protect people. She fears being raped by gang members. She also fears that, because she would stick out as someone who has spent virtually her entire life in the United States, gangs would kidnap her and hold her for a money ransom.

250.    Plaintiff Vilbrun Dorsainvil is reasonably fearful that, if forced to return to Haiti, he would lose his health, dental, and vision insurance through his work. If he is no longer authorized to work by way of TPS for Haitians terminating, he will lose these benefits. In addition, he would be unable to support the people who currently depend on the money he sends to them. Most notably, he would be unable to financially support his cousin, who currently lives with him and has diabetes. Without Mr. Dorsainvil's support, his cousin would not be able to afford his diabetes medical care. Mr. Dorsainvil  fears it would be unsafe for him to return to Haiti due to his and his family's political affiliations, which in the past resulted in the imprisonment of his brother, J.C., the vandalization of J.C.'s home, and his other brother, B., being followed by gangs. He fears he will be a prime target for the gangs to kill, abuse, or hold for a money ransom because, as a professional, they would easily surmise that he had been living abroad, and as a result has money to pay a ransom or knows someone who does. Returning to Haiti would make it very difficult, if not impossible, for him to get basic necessities, such as food, work, and health care, due to there being widespread lawlessness, malnutrition, unemployment, and homelessness in Haiti today. He also fears catching diseases like cholera, dengue, and malaria, which are common and claim lives in Haiti, but which are easily treated in the United States. Even if he was able to

find a job, it would not be safe to get to work considering the pervasive violence in the streets of Haiti.

## CLASS ALLEGATIONS

251.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

252.    Plaintiffs seek to represent the following Proposed Class: All persons in the United States who have been granted, or have applied for, Temporary Protected Status pursuant to 8 U.S.C. § 1254a and 8 C.F.R. § 244.2 and named Haiti as the designated TPS country under which they applied.

253.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impractical.  By the government's own account, over 300,000 Haitians currently hold TPS. 90 Fed. Reg. 28764.

254.    The proposed class satisfies both the commonality and typicality requirements of Rule 23(a)(2) and (3).  Because of Defendants' unlawful decision to "partially vacate", and then terminate, Haiti's TPS designation, all class members face the imminent loss of work authorization and protections from deportation.

255.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  The representative Plaintiffs seek the same relief as the other members of the class: an order setting aside under 5 U.S.C. § 706 the "partial vacatur" and termination of Haiti's TPS designation and a declaratory judgment that the "partial vacatur" and termination of Haiti's TPS designation violated the Fifth Amendment's equal protection guarantee.

256.    The proposed class is represented by experienced attorneys with extensive experience litigating challenges to the government's unlawful TPS terminations, class actions, and other complex cases in federal court.

257.    The proposed class satisfies Rule 23(b)(2).  Defendants have acted on grounds generally applicable to the class by unlawfully "vacating," and then terminating, Haiti's TPS designation; relief is therefore appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### Count One

### (Administrative Procedure Act)

258.    The allegations in paragraphs 1-257 are incorporated by reference as if fully set forth herein.

259.    The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., ensures that federal agencies are accountable to the public by providing a "right of review" to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

260.    The APA directs federal courts to "hold unlawful and set aside agency action" that is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); "without observance of procedure required by law," *id*. § 706(2)(D); or "contrary to constitutional right," *id.* § 706(2)(B).

261.    On February 20, 2025, the Trump administration implemented the first part of its plan to terminate Haiti's TPS designation.  On that date, purporting to "partially vacate" the agency's July 1, 2024, extension of Haiti's designation through February 3, 2026, Defendants declared that Haiti's designation would terminate on August 3, 2025, six months before the previously fixed expiration date.  90 Fed. Reg. 10511, 10511 (Feb. 24, 2025).

262.    In a decision in a separate case, a federal court held that "Secretary Noem does not have statutory or inherent authority to vacate a country's TPS designation" and that therefore "her partial vacatur [of Haiti's TPS designation] must be set aside as unlawful under the APA." *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d at 273.  That court further held that "Secretary Noem cannot reconsider Haiti's TPS designation in a way that takes effect before February 3, 2026, the expiration of the most recent previous extension."  *Id.*

263.    On July 1, 2025, Secretary Noem, employing the "partial vacatur" as a necessary predicate, terminated Haiti's TPS designation effective September 2, 2025.  90 Fed. Reg. 28760. However, due to the district court's ruling in *Haitian Evangelical Clergy Association*—which restored the effective end-date of Haiti's TPS designation to February 3, 2026—Secretary Noem opted to issue a new termination notice.

264.    On November 28, 2025, Secretary Noem issued her new termination notice, effective February 3, 2026.  90 Fed. Reg. 54733.

265.    The termination of Haiti's TPS designation effective February 3, 2026 violates the APA in multiple ways, each of which is an independent basis for setting it aside under 5 U.S.C. § 706.

266.    The termination of Haiti's TPS designation constitutes final agency action.  *Cf.* 5 U.S.C. § 704 (providing that judicial review of APA claims is generally limited to "final agency action for which there is no other adequate remedy in a court").

267.    The termination of Haiti's TPS designation is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law because it was a preordained outcome justified by pretextual reasons. Even before taking office, President Trump stated publicly that he would have Secretary Noem

terminate Haiti's TPS designation.  Accordingly, the decision to terminate Haiti's TPS was made before any "consultation with appropriate agencies of the Government" could have occurred.  8 U.S.C. § 1254a(b)(1).  The decision to terminate Haiti's TPS was made to help fulfill President Trump's campaign promise to rid America of immigrants.  Once in office, Secretary Noem "reverse-engineered facts … to justify termination," "'looking for' an outcome of termination rather than coming to the outcome after a fact-based review of country conditions." *Saget v. Trump*, 375 F. Supp. 3d 280, 362 (E.D.N.Y. 2019).  The process by which the termination was accomplished reflects a departure from past agency processes and practices for making TPS determinations.

268.    The termination of Haiti's TPS designation is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, without observance of procedure required by law, and contrary to constitutional rights because it was motivated by unlawful discriminatory animus.  The Due Process Clause of the Fifth Amendment prohibits the federal government from taking action for which discriminatory intent or purpose is a motivating factor.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The termination of Haiti's TPS designation was motivated by President Trump's and his surrogates' discriminatory intent to remove nonwhite immigrants in general and Haitians in particular.  This discriminatory intent is demonstrated by, among other things, President Trump's and Secretary Noem's own statements about nonwhite immigrants, Haitians, and Haitian TPS holders; the Trump administration's termination of lawful immigration statuses like TPS for nonwhite immigrants; the Trump administration's simultaneous removal of immigration barriers to white immigrants; and the departures from past TPS decision-making process.

## Count Two

### (Fifth Amendment—Equal Protection)

269.    The allegations in paragraphs 1-257 are incorporated by reference as if fully set forth herein.

270.    The Due Process Clause of the Fifth Amendment to the Constitution prohibits the federal government, including Defendants, from denying any person equal protection of the laws. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217–18 (1995); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265-66 (1977).

271.    As demonstrated by President Trump's and Secretary Noem's own words, by their disregard of statutory requirements, by the pretextual reasons given for terminating Haiti's TPS designation, and by their efforts to remove nonwhite immigrants while simultaneously facilitating the entry of white immigrants, the termination of Haiti's TPS designation was, at least in part, improperly motivated by animus and discriminatory intent based on race and ethnicity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Enter an order certifying this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and appointing Plaintiffs and their counsel to represent the members of the class;

b.      Declare that Defendants' termination of Haiti's TPS designation:

   (i)      violates the Administrative Procedure Act because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," "without

observance of procedure required by law", and "contrary to constitutional right"; and

    (ii)    violates the Fifth Amendment's guarantee of equal protection;

c.    Set aside the termination of Haiti's TPS designation as unlawful and unconstitutional;

d.    Award Plaintiffs costs and attorneys' fees; and

e.    Grant such further relief as the Court deems just and proper.

Dated: December 5, 2025

      Respectfully Submitted,
      /s/ *Geoffrey M. Pipoly*

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Andrew Tauber (D.C. Bar No. 495980)
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202) 508-6200
andrew.tauber@bclplaw.com
sarah.hartley@bclplaw.com

Matthew Stanford
BRYAN CAVE LEIGHTON PAISNER, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
Phone: (602) 364-7000
matt.stanford@bclplaw.com

Daniel Paul Mach
BRYAN CAVE LEIGHTON PAISNER, LLP
1290 Avenue of the Americas
New York, NY 10104
Phone: (212) 541-1146
daniel.mach@bclplaw.com

Ira J. Kurzban (D.C. Bar No. 1031506)
Kevin Gregg
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota (D.C. Bar No. NC020)
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org

Raymond Audain
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Phone: (646) 290-6249
raudain@gslawny.com

*Attorneys for Plaintiffs and the
Putative Class*